

**FILED**

Apr 19 2017, 9:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Washburn
Citizens Action Coalition
of Indiana, Inc.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE –
NORTHERN INDIANA PUBLIC
SERVICE COMPANY

Peter J. Rusthoven
Nicholas K. Kile
Barnes & Thornburg LLP
Indianapolis, Indiana

Claudia J. Earls
Christopher C. Earle
Northern Indiana
Public Service Company
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE –
NIPSCO INDUSTRIAL GROUP

Todd A. Richardson
Bette J. Dodd
Jennifer W. Terry
Joseph P. Rompala
Lewis Kappes, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE –
UNITED STATES STEEL
CORPORATION

Nikki G. Shoultz
Bryan H. Babb
Bose McKinney & Evans LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Citizens Action Coalition of Indiana, Inc., | April 19, 2017 |
| *Appellant-Intervenor,* | Court of Appeals Case No. 93A02-1608-EX-1854 |
| v. | Appeal from the Indiana Utility Regulatory Commission |
| Northern Indiana Public Service Company; NIPSCO Industrial Group; and United States Steel Corporation, | The Honorable David Veleta, Administrative Law Judge |
| | The Honorable Carol Stephan, Chair |
| *Appellees-Petitioners* | Cause No. 44688 |

**Baker, Judge.**

Northern Indiana Public Service Company (NIPSCO) filed a petition with the Indiana Utility Regulatory Commission (IURC) seeking to implement a new rate design, pursuant to which certain rates would increase. NIPSCO and other entities, including NIPSCO Industrial Group (Industrial Group) and United States Steel Corporation (US Steel), engaged in settlement negotiations and reached an agreement. Citizens Action Coalition of Indiana, Inc. (CAC), had intervened in the proceeding and objected to the agreement. The IURC ultimately approved the settlement agreement, and CAC now appeals, arguing that there is not substantial evidence supporting the IURC's order and that the IURC should have required the inclusion of a low-income payment assistance plan and the collection and reporting of customer data by NIPSCO. Finding substantial evidence and no other error, we affirm.

# Facts

NIPSCO is a public utility that provides electric service in all or parts of twenty northern Indiana counties. Its customers' electric bills generally consist of a fixed monthly charge (the "fixed charge") plus a variable energy charge (the "energy charge") based on the amount of energy used by the customer, and any additional riders. The customers pay the fixed charge even if they consume no energy in a month; the energy charge equals the approved rate multiplied by the number of kilowatt hours consumed by the consumer in a month.

In October 2015, NIPSCO filed a petition with the IURC seeking authority to increase its rates and charges for providing electric utility service. A number of entities intervened in the legal proceeding, including CAC, the Industrial Group, and US Steel. The Office of Utility Consumer Counselor (OUCC), which represents ratepayers, consumers, and the public, was also a party to the proceeding. NIPSCO sought the rate increase based on a cost of service analysis, which caused NIPSCO to conclude that a fixed rate increase would improve recovery of its fixed costs.

Initially, NIPSCO proposed an increase in the fixed charge for residential and small commercial customers from $11 to $20 and from $20 to $30 per month, respectively. At some point, a subset of entities involved in the proceeding, including the appellees and the OUCC but excluding CAC, engaged in settlement negotiations. On February 19, 2016, those entities jointly submitted to the IURC a Settlement Agreement. Among other things, the Settlement

Agreement provided that the increase in the fixed charges for residential and small commercial customers would be from $11 to $14 and from $20 to $24 per month, respectively.[1]

[5] CAC and other entities[2] opposed the Settlement Agreement. Throughout the process, the parties filed settlement testimony and evidence, filed rebuttal testimony and evidence, and engaged in voluminous discovery. Relevant to this appeal are CAC's arguments related to the fixed charge increase, the low-income payment assistance program, and a request that NIPSCO be required to collect and report certain consumer data. First, as to the fixed charge increase in the Settlement Agreement, CAC offered two basic arguments:

(1)     the fixed charge increase was unreasonable and not in the public interest because it would erect barriers to energy conservation and energy efficiency investments; and

(2)     the fixed charge increase was unjust because it would disproportionately impact low income, elderly, and Black consumers, who CAC contends use less energy on average.

CAC advocated for a different rate design, such that NIPSCO would collect its needed revenue based on an increase in the energy charge rather than the fixed charge.

---

[1] The Settlement Agreement also increases the energy charge, but that increase is not at issue in this appeal.

[2] The other entities are not parties to this appeal.

[6] Second, in its initial petition, NIPSCO proposed a low-income payment assistance program wherein qualified residential customers would receive a $50 credit on their June bills each year. OUCC opposed this proposal because NIPSCO would benefit from the program by reducing expenses and lowering uncollected revenue but would not lower its charges to reflect those reduced costs. OUCC advocated for a voluntary donation program targeted at ratepayers, shareholders, and employees with a donation match from NIPSCO. CAC disliked both of those proposed plans, recommending a plan that includes a low-income rate class and an arrearage program to help low-income ratepayers pay down balances over time. CAC's program would be funded by mandatory surcharges on other customers. In response to OUCC's opposition, NIPSCO withdrew its proposed low-income assistance program; the Settlement Agreement does not contain such a program at all. In opposing the Settlement Agreement, CAC argued that its own low-income assistance program should be included in the settlement.

[7] Third, CAC asked that the IURC require NIPSCO to collect and report the following data: number of general residential and low-income customer accounts, bills, receipts, arrearages, notices of disconnections, bill payment agreements, disconnections of service for nonpayment, reconnections of service after disconnection for non-payment, accounts written off as uncollectible, and accounts sent to collection agencies. According to CAC, this data is critical for the ability of NIPSCO, service organizations, ratepayers, and the general public to understand affordability issues. CAC testified that without timely trend data,

it is not possible to appropriately respond to the payment troubles experienced within the low-income population. Moreover, the IURC has stated in the past that it will not force the adoption of a low-income payment assistance program without sufficient data to determine what is appropriate, but CAC is unable to obtain that data absent a requirement that NIPSCO collect and report it.

[8] The IURC held an evidentiary hearing on April 13, 2016, and on July 18, 2016, it approved the Settlement Agreement without modification in a ninety-six-page order. In relevant part, the order notes as follows:

> Dr. Gaske[, a NIPSCO witness,] determined that the proposed rate levels and structure establish rates that are just, reasonable, and not unreasonably preferential or discriminatory. Dr. Gaske opined that the proposed rate structure and rates should provide NIPSCO a reasonable opportunity to earn a reasonable return on its invested capital and recover its necessary and reasonable operating expenses.
>
> ***
>
> Mr. Shambo[, a NIPSCO witness,] testified that NIPSCO's policy objectives with respect to this proceeding are to achieve rates that are reasonable and just—rates that better align with the recovery of costs from the customers that drive those costs, as well as afford NIPSCO a reasonable opportunity to recover its expenses and earn an appropriate return on its used and useful assets. . . . He emphasized that establishing rates that will allow NIPSCO to recover both its prudently incurred costs to serve customers and a fair return to investors is necessary for NIPSCO to continue to provide safe and reliable electric service to its customers.

***

. . . With respect to fixed charges, Mr. Shambo explained that NIPSCO proposed to take a relatively small step toward further fixed-variable alignment, by increasing the customer charge applicable to residential and small commercial customers, albeit not to the full cost of service level for the customer costs (let alone full fixed costs). Mr. Shambo testified that this increased customer charge would not disproportionately impact low-income customers because NIPSCO's data indicates that the average monthly usage for low-income customers is actually higher than the normal customer population's average monthly usage.

***

. . . Mr. Rábago[, a CAC witness,] testified that NIPSCO's proposed fixed customer charges would create significant barriers and impediments to energy efficiency, conservation, and renewables that would result in improper discrimination against customers investing in these options. . . .

Mr. Rábago argued that the proposed increases in fixed customer charges have a larger impact on some customers over others with the largest burden on low use customers without regard for why they are low users, and minimize impacts on high use customers. . . . He further contended that increasing fixed charges have a disproportionate impact on low usage customers and those that have pursued energy efficiency. He noted that NIPSCO did provide a measure to mitigate the impact on low-income customers, namely, a single bill credit of $50 to be applied to the June bills of [qualified customers]. Mr. Rábago stated that he was not satisfied with a one-time $50 credit offset, an amount that is less than half of the proposed fixed customer charge increase, and the credit will not encourage energy efficiency, and

will not address high bills in other months. . . . Mr. Rábago noted that using volumetric rates instead of fixed customer charges would be more beneficial, noting policy and being less burdensome to low-income customers.

. . . [Mr. Howat, a CAC witness,] recommend[ed] that the Commission direct NIPSCO to implement a comprehensive low-income bill payment assistance program that targets current bill benefits to [eligible customers] and includes an arrearage management design component. Mr. Howat's proposed program would provide fixed credits and a 25% discounted rate for . . . eligible customers. He also recommended that NIPSCO report monthly to the Commission and stakeholders data regarding general residential and low-income customer accounts . . . .

Mr. Howat further argued that increasing utility cost recovery from the volumetric to the monthly customer charge portion of bills disproportionately harms low volume consumers within a rate class. He argued that low-income households, households headed by an African American, and seniors use less electricity than their counterparts. Therefore, he claimed that increased monthly fixed or customer charges cause disproportionate harm. Lastly, he argued that higher fixed charges discourage energy efficiency. . . .

***

. . . [In rebuttal,] Mr. Shambo stated that there are better ways to address energy efficiency and renewable energy than to subsidize it implicitly through rate design. Mr. Shambo also does not believe that the higher customer charge has a negative impact on low-income customers. He provided data that showed that NIPSCO's 18,000 low-income customers show higher usage than NIPSCO's average customer.

. . . He explained that a specific low-income rate [for a payment assistance program] should not be established, as it sends a negative price signal. He also stated that there should not be an arrears program, as that is currently available through assistance agencies and programs and added that NIPSCO's current billing system is not set up to administer such a program so a great deal of time and expense would be needed to make necessary modifications.

\*\*\*

Mr. Shambo also addressed NIPSCO's initial proposed low-income program. He noted that both the OUCC and CAC opposed the program as proposed. Accordingly the Settlement Agreement does not provide for such a program and NIPSCO is no longer proposing such a program in this case. However, he emphasized that NIPSCO will agree to meet with the OUCC and any other interested parties, independent of this rate case, to discuss the parameters of a similar program that could be requested in the Company's next base rate case.

. . . He noted that the Settlement Agreement is consistent with the public interest by providing all customer segments with a reasonable outcome and providing NIPSCO with a solid foundation from which it can invest in northern Indiana's energy infrastructure, help fuel job creation and economic growth, and provide customers with means to manage their energy consumption and bills. . . .

\*\*\*

. . . [T]he OUCC, as the statutory representative of all ratepayers, believes the Settlement Agreement is a fair resolution, supported by evidence and should be approved.

***

. . . Mr. Rábago argued that the compromise between NIPSCO and the OUCC is an inadequate foundation for the approval of the fixed customer charge increase. . . . He recommended that the Commission disapprove any proposed increase in a fixed customer charge, and adopt [CAC's payment assistance] proposal.

***

. . . Mr. Shambo pointed out that the evidence in this case establishes that NIPSCO's fixed customer and distribution costs for each residential customer are greater than $14.00 per month, and that a $3.00 customer charge increase, from $11.00 to $14.00, is reasonable. . . .

. . . He further noted that [CAC's] low-income proposal is burdensome, including the adverse impact on industrial customers who would see no benefit from the program. . . .

***

**Commission Discussion and Findings**. . . .

***

. . . Mr. Rábago was the only witness in opposition to the proposed Settlement Agreement increase to the customer charge, suggesting that it is inconsistent with "sound ratemaking principles." We disagree with Mr. Rábago. . . . [T]he Commission finds that the increase in the monthly customer charge from $11.00 to $14.00 for residential customers and from $20.00 to $24.00 for small commercial customers is cost-based

based upon the evidence presented, consistent with gradualism, and is reasonable and should be approved.

***

In its case-in-chief, NIPSCO proposed a low-income program. However, the OUCC and CAC both opposed the program as proposed by NIPSCO, and offered their own proposals for alternative programs. NIPSCO withdrew its request for approval of a low-income program in this case. NIPSCO stated it may present a similar program in the future and indicated its willingness to continue discussing such a program with its stakeholders. No other party supported the form of program proposed by CAC, which was actively opposed by several parties. . . . [In a prior rate case,] we recognized the importance of the issue raised by the CAC, but found that there are numerous implementation and policy related concerns and declined to adopt the CAC's program in that case. The CAC provided us with no better record or rationale in this case as to why we should adopt such a program . . . . The OUCC filed testimony in this case opposing NIPSCO's proposed low-income program and . . . provided testimony concerning certain utilities' voluntary "Round Up" programs that might be more appropriate from the OUCC's perspective. . . .

Notwithstanding, the Commission is perplexed over the sequence of events that led to NIPSCO's decision to ultimately not offer a low-income proposal. NIPSCO, not the CAC, was the first to propose a low-income program. The CAC offered an alternative program in response. It would have made sense for NIPSCO to engage the CAC and other parties to discuss alternatives and to reach a consensus on an alternative. The evidence points to the CAC being left out of any settlement discussion. . . . It is confounding to understand the exclusion of parties with mutually held goals. Few initial proposals are accepted by all parties at the onset. When offering a proposal, the expectation would be for

the utility to act in good faith and afford all the parties the opportunity to dialogue, with the goal of reaching consensus.

Further, as for CAC's recommendation that NIPSCO collect and report on trend data on arrearages, disconnections, and related data points, as we noted in [an earlier order in a different case], "we decline to order such collection and reporting solely on the basis of the evidence before us. We believe that any such effort is best pursued by the utility and interested stakeholders outside the regulatory constraints of a specific Commission directive." *Indianapolis Power & Light*, 2016 WL 1118795, at *72.

Appealed Order p. 13, 27, 28, 45-46, 58, 71-72, 74, 78-80, 88, 90-91. CAC now appeals.

# Discussion and Decision

# I. Standard of Review

The General Assembly created the IURC "primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." *Ind. Gas Co. v. Ind. Fin. Auth.*, 999 N.E.2d 63, 65 (Ind. 2013) (internal quotation removed). Because the "complicated process of ratemaking" is "a legislative rather than judicial function," it "is more properly left to the experienced and expert opinion present in the Commission." *Office of Util. Consumer Counselor v. Pub. Serv. Co. of Ind.*, 463 N.E.2d 499, 503 (Ind. Ct. App. 1984).

An order from the IURC is presumed valid unless the contrary is clearly apparent. *Citizens Action Coalition of Ind., Inc. v. S. Ind. Gas and Elec. Co.*, 70

N.E.3d 429, 438 (Ind. Ct. App. 2017). More specifically, "[o]n matters within its jurisdiction, the IURC enjoys wide discretion and its findings and decision will not be lightly overridden simply because we might reach a different decision on the same evidence." *Id.* at 439. Essentially, "so long as there is *any* substantial evidence to support the rates as fixed by the Commission as reasonable, the judicial branch of the government will not interfere with such legislative functions" and has "no power or authority to substitute [its] personal judgment for what [it] might think is fair or reasonable in lieu of the [IURC's] administrative judgment." *Boone Cty. Rural Elec. Membership Corp. v. Pub. Serv. Comm'n*, 239 Ind. 525, 532, 159 N.E.2d 121, 124 (1959) (emphasis added).

[12] In reviewing an IURC decision, we apply a multi-tiered standard of review. *Citizens Action Coalition of Ind., Inc. v. S. Ind. Gas and Elec. Co.*, 45 N.E.3d 483, 491 (Ind. Ct. App. 2015). First, we must determine whether specific findings exist as to all factual determinations material to the ultimate conclusions. *Id.*; *see also Capital Improvement Bd. of Mgrs. v. Pub. Serv. Comm'n*, 176 Ind. App. 240, 260, 375 N.E.2d 616, 631 (1978) (holding that the findings "must be specific enough to enable the court to review intelligently the Commission's decision"). Second, we must consider whether substantial evidence supports the IURC's findings of fact. *Citizens Action*, 45 N.E.3d at 491; *see also N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1016 (Ind. 2009) (observing that the IURC's order will stand "unless *no* substantial evidence supports it") (emphasis added). Finally, we must determine whether the decision is contrary to law. *Citizens Action*, 45 N.E.3d at 491. In conducting our review, we neither reweigh the

evidence nor assess witness credibility and will focus solely on the evidence most favorable to the IURC's findings. *Ind. Gas*, 999 N.E.2d at 66.

[13] Furthermore, where, as here, we are considering the IURC's approval of a settlement contract, substantial deference is required. Because approval of settlement agreements is intrinsic to the IURC's supervision and regulation of utility rates, "substantial deference [is] owed to the Commission in supervising settlements and even modifying or revoking orders entered attendant thereto." *U.S. Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 803-04 (Ind. 2000). This is especially true when, as here, the OUCC—which represents ratepayers, consumers, and the public—has joined the settlement agreement. *See Citizens Action Coalition of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 796 N.E.2d 1264, 1268 (Ind. Ct. App. 2003) (rejecting CAC challenge to settlement agreement, including CAC claim that an IURC-approved settlement should be subject to the more rigorous inspection of a settlement in class action cases).

## II.  Rate Design

[14] Any change to a utility charge "shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful." Ind. Code § 8-1-2-4. Here, CAC contends that the rate design included in the Settlement Agreement (and the IURC Order), which incorporates an increase in the fixed charge for residential and small commercial consumers, is unjust and unreasonable. CAC has three primary reasons for this position:  first, CAC contends that NIPSCO did not produce substantial evidence to support the

increase to the fixed charge; second, CAC argues that this rate design discourages energy efficiency and conservation; and third, it contends that this rate design will have a disparate, deleterious impact on low-income, Black, and elderly populations.[3]

## A. Substantial Evidence

CAC insists that NIPSCO has failed to produce evidence proving that its proposal is just and reasonable:

> it produced no evidence of actual cost shifts or "cross subsidies" resulting from its existing rate design that would require raising fixed charges for all residential and small commercial customers. NIPSCO has further failed to demonstrate that it faces any financial harm due to current fixed cost recovery mechanisms that would justify its attempt to guarantee earnings through fixed charges.

Appellant's Br. p. 25. According to the CAC, the IURC's Order "advances the common, but flawed, ratemaking premise that fixed *costs* should be collected through fixed *charges*. Yet, NIPSCO offered no evidence to support the concept that the nature of a cost, as either fixed or variable, should dictate the form of the charge used to recover such a cost." *Id.* at 25-26 (emphases original). CAC

---

[3] CAC also argues that the IURC improperly relied upon a 2016 Order from a different case in reaching its conclusions in this case. We agree with CAC that it would be problematic if the IURC had considered a separate case with different parties and different issues to be binding on this case, but it is apparent that it did not. Instead, IURC simply cited to its analysis in that case, finding its reasoning and rationales to be equally applicable here. We see no problem with this approach. Additionally, we note that another panel of this Court just affirmed the IURC's order in that case. *Citizens Action Coalition of Ind., Inc. v. Indianapolis Power & Light Co.*, --- N.E.3d ---, 93A02-1604-EX-804 (Ind. Ct. App. Apr. 5, 2017).

argues that NIPSCO did not prove that raising the fixed charge is preferable to the many other alternative rate designs available to it.

[16] Whether or not there is another rate design that is preferable, however, is not our inquiry. Our inquiry is limited to whether there is substantial evidence supporting the IURC's acceptance of the Settlement Agreement. The record reveals the following evidence supporting the rate design contained in the agreement:

- A NIPSCO witness attested that "recovering fixed costs in a fixed customer charge, and variable costs in a variable energy charge, gives consumers appropriate price signals that allow them to efficiently determine whether the marginal cost justifies the marginal benefit of additional consumption." Tr. Ex. Vol. 11 p. 114.
- Another NIPSCO witness testified that with this rate design, NIPSCO sought "rates that better align with the recovery of costs from the customers that drive those costs[.]" Appellant's App. Vol. II p. 45.
- The increase in the fixed charge would "reduce subsidies between and among customer classes" (in other words, reducing the degree to which larger customer rates subsidized lower rates for residential and small commercial customers), but "moderate any rate shock by incorporating gradualism" (in other words, refraining from increasing the fixed charge to an amount that fully reflects NIPSCO's fixed costs). *Id.*
- This rate design is not a true "straight fixed variable" structure, because while there is a small increase in the fixed charge, "a substantial amount of fixed costs would continue to be recovered in the [usage-based] energy charge[.]" Tr. Ex. Vol. 11 p. 124.
- Furthermore, the increase in the fixed charge will "significantly reduce the percentage increase in the [usage-based] energy charges that would otherwise be required" to meet NIPSCO's revenue requirement. *Id.* at 129.
- This rate design, including the increase in the fixed charge, is "commensurate with other electric utilities in the state." *Id.* at 130.

Moreover, this rate design will recover "only a small minority of [NIPSCO's] fixed costs[.]" *Id.* at 125.

- CAC's proposal—that NIPSCO recover its revenue with an increase in the energy charge as opposed to the fixed charge—provides "inefficient price signals that distort consumers' consumption decisions by setting the marginal price far above the marginal cost of either consuming, or foregoing consumption of, additional kilowatt-hours of electricity." *Id.* at 113. This proposed structure, therefore, would "discourage[] consumption that would be efficient in the sense that the marginal benefit of consuming additional units of electricity exceed[s] the marginal cost of the energy required to produce that electricity." *Id.* at 115.

- OUCC engaged in robust negotiations with NIPSCO that ultimately resulted in an increase in the fixed charge of 27%, as opposed to the 82% increase originally proposed by NIPSCO. OUCC, which represents all ratepayers, testified that this compromise "is a fair resolution, supported by evidence, and should be approved." Appellant's App. Vol. II p. 92.

CAC may genuinely believe that a different rate design is preferable, and some reasonable ratepayers may agree with that belief, but the evidence in the record readily supports the IURC's decision to accept the Settlement Agreement. The IURC has the expertise to analyze and weigh the complex competing evidence on this issue, and we can only conclude that there is substantial evidence supporting its decision to accept the proposed rate design, including the increase in the fixed charge.

## B. Energy Conservation

Next, CAC argues that the IURC failed to make specific findings of fact or an ultimate finding of reasonableness with respect to CAC's argument that the fixed charge increase would discourage energy conservation and efficiency. Specifically, this rate design "allows NIPSCO to shift cost recovery more to the

flat fee for all customers which limits a customer's ability to reduce his bill by reducing consumption and discourages energy conservation by reducing the economic incentive for efficiency." Appellant's Br. p. 28. According to CAC, the IURC failed to adequately address this contention.

[18] We find the analysis of this Court on this precise issue in a very recent case to be instructive. In *Citizens Action Coalition of Ind., Inc. v. Indianapolis Power & Light Co.*, --- N.E.3d ---, 93A02-1604-EX-804 (Ind. Ct. App. Apr. 5, 2017), CAC argued that the IURC had failed to make sufficient findings as to whether the rate design in that case discouraged energy conservation and efficiency, asking that this Court remand for specific findings on the issue. We disagreed:

> We do not find this particular relief warranted. Joint Intervenors did not bring a declaratory judgment action; rather, they intervened in a rate case. Rate-making is a legislative as opposed to a judicial function, and our Indiana Legislature has seen fit to establish a commission for the express purpose of hearing evidence and balancing and weighing the many complicated factors which must be taken into consideration in setting utility rates. *State ex rel. Indianapolis Water Co. v. Boone Circuit Court*, 261 Ind. 583, 586-87, 307 N.E.2d 870, 872 (1974). The enabling act does not authorize the Commission to issue declaratory rulings. *See U.S. Steel Corp. v. No. Ind. Public Serv. Co., Inc.*, 482 N.E.2d 501, 506 (Ind. Ct. App. 1985), *trans. denied.*
>
> In their insistence upon particular language, Joint Intervenors attempt to shift the focus from the reasonableness of the order approving the rate change as a whole to one component. . . .

Slip op. p. 17-18. Here, likewise, the IURC was not required to make specific findings on this particular argument raised by CAC. Instead, it was required to consider NIPSCO's rate design scheme as a whole, making specific findings as to all factual determinations material to the ultimate conclusions. *Citizens Action*, 45 N.E.3d at 491. The IURC made specific findings about the rate design, including the increase in the fixed rate charge:

> As we found recently in [another] rate case . . . , the increase in the [fixed] customer charge was a "move toward a more fixed and variable rate design consistent with traditional causation principles," while being "demonstratively short of [straight fixed variable] rates." We further found that, "[c]ost recovery design alignment with cost causation principles sends efficient price signals to customers, allowing customers to make informed decisions regarding their consumption of the service being provided." Lastly, we note that, "this structure does not violate principles of gradualism, because gradualism is best considered in the context of the entire customer bill and not discrete charges within the bill." For these same reasons, the Commission finds that the increase in the [fixed] monthly customer charge . . . is cost-based upon the evidence presented, consistent with gradualism, and is reasonable and should be approved.

Appealed Order p. 88 (internal citations omitted). These findings are specific to the factual determinations material to the ultimate conclusions, and we have already found that there is sufficient evidence supporting these findings. We disagree with CAC that it was incumbent upon IURC to address its specific argument regarding energy conservation.

[19]     Here, as in the recent case quoted above, CAC also argues that the approval of this rate design "despite its deleterious effect on conservation and energy-efficiency is contrary to federal law and state rule." Appellant's Br. p. 32. Again, we find the analysis of this Court helpful and on point:

> . . . The parties do not dispute the proposition that public policy, federal and State, favors and encourages conservation.

> Nonetheless, encouragement is not a mandate. Joint Intervenors direct us to no statutory requirement that each individual component of a rate scheme reflect the most environmentally conservative approach or that abandonment of older methodology be immediate and total. At bottom, Joint Intervenors suggest a reweighing of evidence, with conservation – based upon their interpretation of customer usage signals – being paramount. They do not demonstrate the unreasonableness of the rate increase as a whole.

*Citizens Action*, No. 93A02-1604-EX-804, at slip op. p. 19. Here, likewise, CAC has not directed our attention to any federal law or state rule mandating a different result in this case. Again, reasonable people may, and likely do, agree with CAC that this rate design scheme is less than ideal with respect to the important issues of energy conservation and efficiency. But that is immaterial to our review of the IURC's decision, which contains sufficient findings and is supported by substantial evidence.

## C.  Impact on Certain Populations

[20]     Similar to its energy conservation argument, CAC contends that the IURC failed to make specific findings or an ultimate finding of reasonableness

regarding its allegation that the fixed rate increase will have a disproportionate impact on low-income, elderly, and Black consumers. CAC insists that NIPSCO's "presentation of data [on this issue] was very misleading, incomplete, and was effectively rebutted by CAC. Regardless, the Commission failed to make a basic finding of fact or conclusion of law on the material issue raised of how an increased fixed charge affects low volume users of electricity, who in NIPSCO's service territory are low income customers, elderly customers, and African American customers." Appellant's Br. p. 31. CAC asks us to remand so that the IURC can make specific findings on this issue.

[21] As noted above, however, this is not a declaratory judgment action, and the IURC is required to make specific findings only on factual determinations that are material to the ultimate issue, which is the justness and reasonableness of the rate design and its effect on ratepayers *as a whole*. As this Court recently held,

> [e]ven assuming that [the proposed rate design] has a disproportionate negative impact upon certain groups of customers, the Commission is required by statute to approve rates that are fair and reasonable inclusive of the entire customer base. There is no statutory requirement that the impact upon particular sub-groups be separately addressed. Joint Intervenors have not demonstrated that the Commission failed to conform to statutory standards.

*Citizens Action*, No. 93A02-1604-EX-804, at slip op. p. 20. Here, likewise, there was no requirement that the IURC make specific findings related to particular sub-groups of ratepayers. It found the rate design to be just and reasonable as a

whole as related to all ratepayers, *see* Appealed Order p. 87, and given our standard of review, we are compelled to defer to that conclusion as there is substantial evidence supporting it.

## III. Payment Assistance Program and Data Collection

Finally, CAC argues that the IURC erred because it did not require NIPSCO to include a low-income payment assistance program as part of the rate design or to collect and report data on its customers. At the beginning of the settlement negotiations, NIPSCO had included a payment assistance program as part of its rate design, but OUCC objected to that particular program. Consequently, NIPSCO withdrew its proposed payment assistance program from the final Settlement Agreement. CAC proposed its own version of a payment assistance program, but none of the other involved entities approved of its proposal. In the end, therefore, the IURC's order does not contain a payment assistance program at all.

Initially, we note that we share in the IURC's concern and perplexment as to how and why CAC was left out of the settlement negotiations. Had CAC been included, it is entirely possible, if not likely, that a compromise could have been reached such that a payment assistance program would have been included in the Settlement Agreement. It seems as though all agree that it would be preferable to have such a program included. We echo the IURC's strong encouragement that, in future cases, the utilities will act in good faith by including all parties in the negotiations.

[24] That said, the IURC dedicated a lengthy paragraph in its order explaining why it declined to order the adoption of CAC's proposed payment assistance plan:

> No other party supported the form of program proposed by CAC, which was actively opposed by several parties. Mr. Rábago addressed the elimination of NIPSCO's proposed low-income program of an annual credit of $50 applied to the June bill in his opposition to the Settlement Agreement. He noted that the residential customers face an annual fixed customer charge increase of $36, but stated there are also increases in volumetric rates. . . . [In a prior rate case], we recognized the importance of the issue raised by the CAC, but found that there are numerous implementation and policy related concerns and declined to adopt the CAC's program design in that case. The CAC provided us with no better record or rationale in this case as to why we should adopt such a program . . . The implications and policy concerns expressed in [the other case] persist in this Cause.

Appealed Order p. 90. The IURC, which is the entity statutorily charged with negotiating these complex regulatory waters, found that there are "numerous implementation and policy related concerns" with respect to the program proposed by CAC. We will not second-guess the IURC's assessment in that regard.

[25] NIPSCO elected to withdraw its own proposed payment assistance plan when it faced resistance from OUCC, the entity charged with representing all ratepayers.[4] We think it best for the General Assembly to address legislatively

---

[4] CAC argues that NIPSCO's payment assistance plan was included (by mistake) in the final Settlement Agreement as approved by the IURC. It is apparent, however, that NIPSCO explicitly withdrew this plan

whether and how utilities should be required to collect and report such data on a statewide basis. The IURC was certainly not required to force NIPSCO to re-insert its proposal. It is extremely regrettable that the result of this process is a rate design including rate increases with no assistance available for low-income consumers. But under these circumstances, we cannot say that the IURC erred in entering the order without such a program included.

[26] CAC also contends that NIPSCO should be required to collect and report data about its consumers so that, in the future, CAC would be able to provide the evidence on these matters that the IURC has found to be lacking. The IURC, however, concluded that "any such effort is best pursued by the utility and interested stakeholders outside the regulatory constraints of a specific Commission directive." *Id.* at 91. In addition to the IURC's conclusion, we would also point out that the cost of undertaking the collection and reporting of this sought-after data would certainly be passed onto the consumers whose rate increases CAC is attempting to minimize. Furthermore, the type of sensitive data that CAC believes should be collected would potentially intrude on the privacy of ratepayers. Under these circumstances, we decline to reverse the IURC's order on the basis that it did not order the collection and reporting of this information.

---

during the proceedings. To force its inclusion under these circumstances would be to countenance the "gotcha" litigation of which we disapprove. We decline to do so.

The judgment of the IURC is affirmed.

Barnes, J., and Crone, J., concur.