## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 21 2018, 8:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jennifer A. Washburn
Margo Tucker
Citizens Action Coalition of Indiana, Inc.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Derek R. Molter
Kay E. Pashos
Ice Miller LLP
Indianapolis, Indiana

Kelley A. Karn
Melanie D. Price
Duke Energy Business Services, LLC
Indianapolis, Indiana

### IN THE
# COURT OF APPEALS OF INDIANA

Citizens Action Coalition of Indiana, Inc.,

*Appellant-Intervenor,*

v.

Duke Energy Indiana, LLC,

*Appellee-Petitioner.*

August 21, 2018

Court of Appeals Case No. 18A-EX-141

Appeal from the Indiana Utility Regulatory Commission

The Honorable Sarah E. Freeman, Commissioner

The Honorable David E. Veleta, Senior Administrative Law Judge

**Bradford, Judge.**

# Case Summary

[1] Appellant-Intervenor Citizens Action Coalition of Indiana, Inc. ("CAC") appeals from the Indiana Utility Regulatory Commission's ("the Commission") order approving an energy efficiency ("EE") plan filed by Appellee-Petitioner Duke Energy Indiana, LLC's ("Duke") in accordance with Indiana Code section 8-1-8.5-10 for the years 2017 through 2019. Specifically, CAC contends that the Commission abused its discretion in finding Duke's proposed EE goals and lost revenue recovery rate to be reasonable. Concluding otherwise, we affirm.

# Facts and Procedural History

[2] Duke is an electricity supplier servicing both individuals and businesses in Indiana. In 2015, the General Assembly passed a statute requiring electricity suppliers to file EE plans and goals for approval by the Commission beginning

no later than 2017. As an incentive for participation, the General Assembly included provisions allowing electricity suppliers to recover certain costs associated with their EE plans, including lost revenues. This case stems from the Commission's approval of Duke's EE plan for the three-year term running from 2017 to 2019 ("Duke's proposed EE Plan").

[3] On May 28, 2015, Duke sought approval of an EE plan for the three-year term running from 2016–2018. In this plan, Duke proposed a lost revenue rate that allowed for recovery of lost revenues over the measure's life or until the utility's next basic rate case, whichever was shorter. The Commission rejected Duke's plan, finding, in part, that the recovery of lost revenues should be limited to a four-year term. Shortly thereafter, we found that a nearly identical provision in a case involving a different energy provider was unreasonable. *See S. Ind. Gas & Elec. Co. v. Ind. Util. Regulatory Comm'n*, 2017 WL 899947, at *7 (March 7, 2017).

[4] On November 22, 2016, Duke filed a petition seeking approval of Duke's proposed EE Plan. Duke proposed EE goals that are expected to result in an energy savings of approximately 1.1% of eligible retail sales for each year of the plan. It again proposed a lost revenue rate that allowed for recovery of lost revenues over the measure's life or until the utility's next basic rate case, whichever was shorter. Pursuant to Duke's proposed EE Plan, Duke's recovery of forecasted lost revenues would be reconciled with actual losses following an independent evaluation. The total cost of Duke's proposed EE Plan equaled $110,233,151.

On November 28, November 30, 2016, and February 6, 2017, respectively, Nucor-Steel-Indiana, a division of Nucor Corporation, CAC, and the Duke Industrial Group (collectively, "the Intervenors") filed petitions to intervene in the proceeding. The Commission subsequently granted those petitions. Duke and the Intervenors filed extensive evidence prior to an August 17, 2017 evidentiary hearing. On December 28, 2017, the Commission approved Duke's EE Plan.

# Discussion and Decision

## I. Standard of Review

"The General Assembly created [the Commission] primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." *Ind. Gas Co., Inc. v. Ind. Fin. Auth.*, 999 N.E.2d 63, 65 (Ind. 2013). "The Commission's assignment is to insure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana." *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009). "Because the complicated process of ratemaking is a legislative rather than judicial function, it is more properly left to the experienced and expert opinion present in the Commission." *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 76 N.E.3d 144, 151 (Ind. Ct. App. 2017) (internal quotations omitted).

An order from the Commission is presumed valid unless the contrary is clearly apparent. *Id.* "More specifically, on matters within its jurisdiction, [the Commission] enjoys wide discretion and its findings and decision will not be

lightly overridden simply because we might reach a different decision on the same evidence." *Id.* (brackets and internal quotation omitted). "Essentially, so long as there is any substantial evidence to support the rates as fixed by the Commission as reasonable, the judicial branch of the government will not interfere with such legislative functions and has no power or authority to substitute its personal judgment for what it might think is fair or reasonable in lieu of [the Commission's] administrative judgment." *Id.* (brackets, emphasis, and internal quotations omitted).

[8] Commission orders are subject to a multi-tier review. *Ind. Gas*, 999 N.E.2d at 66.

> First, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. We review the conclusions of ultimate facts, or mixed questions of fact and law, for their reasonableness, with greater deference to matters within [the Commission's] expertise and jurisdiction. Second, the findings of fact must be supported by substantial evidence in the record. We neither reweigh the evidence nor assess the credibility of witnesses and consider only the evidence most favorable to [the Commission's] findings. Finally, we review whether IURC action is contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order.

*Id.* (internal citations and quotation omitted).

## II. General Overview of the Relevant Statutory Authority

Indiana Code section 8-1-8.5-10(h) provides that beginning not later than 2017, and not less than one time every three years, "an electricity supplier shall petition the [C]ommission for approval of a plan that includes: (1) energy efficiency goals; (2) energy efficiency programs to achieve the energy efficiency goals; (3) program budgets and program costs; and (4) evaluation, measurement, and verification [("EM&V")] procedures that must include independent [EM&V]." In determining whether a plan submitted under subsection (h) is reasonable, the [C]ommission shall consider the following:

(1) Projected changes in customer consumption of electricity resulting from the implementation of the plan.

(2) A cost and benefit analysis of the plan, including the likelihood of achieving the goals of the energy efficiency programs included in the plan.

(3) Whether the plan is consistent with the following:

(A) The state energy analysis developed by the commission under section 3 of this chapter.

(B) The electricity supplier's most recent long range integrated resource plan submitted to the commission.

(4) The inclusion and reasonableness of procedures to evaluate, measure, and verify the results of the energy efficiency programs included in the plan, including the alignment of the procedures with applicable environmental regulations, including federal regulations concerning credits for emission reductions.

(5) Any undue or unreasonable preference to any customer class resulting, or potentially resulting, from the implementation of an energy efficiency program or from the overall design of a plan.

(6) Comments provided by customers, customer representatives, the office of utility consumer counselor, and other stakeholders concerning the adequacy and reasonableness of the plan, including alternative or additional means to achieve energy efficiency in the electricity supplier's service territory.

(7) The effect, or potential effect, in both the long term and the short term, of the plan on the electric rates and bills of customers that participate in energy efficiency programs compared to the electric rates and bills of customers that do not participate in energy efficiency programs.

(8) The lost revenues and financial incentives associated with the plan and sought to be recovered or received by the electricity supplier.

(9) The electricity supplier's current integrated resource plan and the underlying resource assessment.

(10) Any other information the [C]ommission considers necessary.

Ind. Code § 8-1-8.5-10(j).

# III. Approval of Duke's Proposed EE Goals

"'Energy efficiency goals' means all energy efficiency produced by cost effective plans that are: (1) reasonably achievable; (2) consistent with an electricity supplier's integrated resource plan; and (3) designed to achieve an optimal

balance of energy resources in an electricity supplier's service territory." Ind. Code § 8-1-8.5-10(c). Review of the record reveals that Duke and each of the Intervenors submitted extensive evidence relating to the reasonableness of Duke's proposed EE goals both prior to and during the evidentiary hearing. The Commission noted that it considered all of the evidence, including CAC's asserted discrediting evidence.

[11] In its order, the Commission noted that Duke "proposes EE goals to be achieved through its 2017-2019 Plan that are expected to result in energy savings of approximately 1.1% of eligible retail sales for each year of the three-year Plan." Appellant's App. Vol. II, p. 45. The Commission determined that Duke's "EE goals meet the requirement that it is reasonably achievable, designed to achieve an optimal balance of energy resources and consistent with [Duke's] 2015 IRP." Appellant's App. Vol. II, p. 47.

[12] In challenging the Commission's determination that Duke's proposed EE goals were reasonable, CAC does not challenge any of the Commission's factual findings. It merely argues that this court should re-evaluate and reweigh the evidence, giving its evidence greater weight. Again, in reviewing the Commission's determination that a plan is reasonable, we will neither reweigh the evidence nor reassess witness credibility. *Ind. Gas*, 999 N.E.2d at 66. As such, because the record contains evidence supporting the Commission's determination, we will not override the Commission's determination that Duke's EE goals were reasonable. *See Citizens Action Coal.*, 76 N.E.3d at 151

(providing that the Commission's decision will not be overridden simply because we might have reached a different decision on the same evidence).

## IV. Approval of Duke's Proposed Lost Revenue Rate

It is undisputed that rates charged by a utility company must be just and reasonable. In challenging the Commission's approval of Duke's EE Plan, CAC argues that the rate of lost revenue funds recoverable by Duke was both unjust and unreasonable. For its part, Duke argues the opposite.

Indiana Code section 8-1-8.5-10(h) requires an energy provider to obtain approval of an EE plan independent of its required rate plans. Once the Commission has found a proposed EE plan to be reasonable, it "shall allow the electricity supplier to recover or receive …[r]easonable lost revenues." Ind. Code § 8-1-8.5-10(o). "'Lost revenues' means the difference, if any, between: (1) revenues lost; and (2) the variable operating and maintenance costs saved; by an electricity supplier as a result of implementing energy efficiency programs." Ind. Code § 8-1-8.5-10(e).

> A retail rate adjustment mechanism proposed by an electricity supplier … to implement the timely recovery of program costs (including reasonable lost revenues) may be based on a reasonable forecast, with consideration given to the electricity supplier's historical lost revenue forecasting accuracy. If forecasted data is used, the retail rate adjustment mechanism must include a reconciliation mechanism to correct for any variance between the forecasted program costs (including reasonable lost revenues and financial incentives) and the actual program costs (including reasonable lost revenues and financial

incentives based on the [EM&V] of the [EE] programs under the plan).

Ind. Code § 8-1-8.5-10(o).

## A. Whether the Approved Rate is Unreasonably High

CAC notes that Indiana Code section 8-1-8.5-10 only allows for the recovery of reasonable lost revenues and asserts that the Commission exceeded its discretion by allowing the recovery of up to $63,448,839 in lost revenues for EE programs projected to cost $110,233,151 to administer. Specifically, CAC claims that "[t]his lost revenue guaranteed rate is outside the zone of reasonableness in light of the legal framework, ratemaking policy, regulatory history, objective of the required cost-effectiveness in the statute, and the appropriate degree of reliability in forecasting estimated savings out beyond a few immediate years." Appellant's Br. p. 27.

Duke correctly asserts, however, that in making this claim, CAC "does not identify any legal basis for imposing any particular limit regarding a ration between recoverable lost revenues and other program costs," nor does it "make any showing that the ration in this particular case renders rates 'artificially high.'" Appellee's Br. p. 29. The Commission heard extensive evidence regarding lost revenues and how such revenues would be calculated. In approving Duke's EE Plan, the Commission required independent EM&V to reconcile proposed costs, including lost revenues, to those actually incurred in

order to ensure that the lost revenue rate applied in connection to the EE Plan was not too high.

[17] The Commission considered the extensive evidence presented both by Duke and the Intervenors and determined that Duke's rate for the recovery of lost revenues was reasonable. CAC does not challenge any of the Commission's specific findings. Rather, its challenge on appeal effectively amounts to a request for this court to reweigh the evidence submitted before the Commission, which we will not do. *Ind. Gas*, 999 N.E.2d at 66. Based on our review of the record, we conclude that the Commission's order is consistent with the requirements of Indiana Code section 8-1-8.5-10(o).

## B. Whether the Commission Impermissibly Deviated from Past Precedent

[18] CAC argues that the Commission impermissibly deviated from the approach it adopted in its decision relating to Duke's petition relating to its plan for the years 2016 through 2018. With respect to lost revenues, the Commission's order in that case reads as follows:

> Although we have previously approved lost revenues over a measure's life or until a utility's next base rate case, whichever is shorter, … the other parties' concerns with pancaking and the increased length of time between base rate cases for utilities in Indiana raise a valid concern. Clearly, pancaking of lost revenue is much less of an issue in an environment where a utility comes in regularly, i.e., every three to five years, for a base rate case…. Because we believe the parties raise a valid concern, we find that Petitioner's lost revenue recovery should be limited to: (1) four years or the life of the measure, whichever is less, or (2) until

rates are implemented pursuant to a final order in Petitioner's next base rate case, whichever occurs earlier.

*In re Duke Energy Ind., Inc.*, Cause No. 43955 DSM 3, 2016 WL 943945, at *53 (Mar. 9, 2016).

[19] The Commission included a nearly identical provision in its order issued in *In re Southern Indiana Gas & Electric Co.*, Cause No. 44645, 2016 WL 1179962, at *28–29 (March 23, 2016). On appeal from that order, we reversed the portion of the Commission's order relating to the four-year cap. *S. Ind. Gas & Elec. Co.*, 2017 WL 899947, at *7 ("the *Vectren South* case"). We remanded the matter to the Commission with instructions that the Commission could either

> (1) issue specific factual findings to justify its implicit determination that Vectren South's lost revenue recovery proposals are unreasonable, determine that the Plan is not reasonable in its entirety pursuant to Section 10(m), and allow Vectren South to submit a modified plan within a reasonable time; or (2) issue specific factual findings to justify a determination that the Plan is in fact reasonable in its entirety pursuant to Section 10(k) and allow Vectren South to recover reasonable lost revenues in accordance with the Plan.

*Id.* On remand, the Commission rejected CAC's preferred four-year recovery period and found that Vectren South's plan was reasonable.[1] *In re S. Ind. Gas & Elec. Co.*, Cause No. 44645, 2017 WL 6618867, at *12 (December 20, 2017).

[20]     CAC acknowledges our decision in the *Vectren South* case, but nonetheless argues that because our decision did not explicitly rule out a four-year recovery period, the Commission should have adopted that approach. CAC claims that such an approach would be justifiable so long as the Commission made appropriate factual findings in support thereof. Here, however, the Commission made no such findings, and CAC does not point to sufficient evidence in the record on which the Commission could have relied. Instead, CAC merely points to alleged deficiencies in the approach adopted by the Commission.

[21]     It is undisputed that the Commission has previously approved the recovery of lost revenues over a measure's life or until a utility's next base rate case, whichever is shorter. The Commission adopted this approach in this case and the Commission's determination is supported by the evidence. Given that CAC failed to point to adequate evidence to support its favored four-year approach and in light of our memorandum decision issued in the *Vectren South* case, we conclude that the Commission did not unjustifiably deviate from CAC's

---

[1] Vectren South's plan is, in relevant part, similar to Duke's proposed EE Plan as it allows for recovery over the measure's life or until the utility's next base rate case, whichever is shorter, and requires reconciliation through EM&V.

favored precedent.[2] CAC's challenge to the evidence supporting this approach amounts to a request that we reweigh the evidence, which, again, we will not do.[3] *Ind. Gas*, 999 N.E.2d at 66.

## C. Whether the Evidence is Sufficient to Support the Commission's Order

[22] In arguing that the Commission's order was not supported by adequate substantial evidence, CAC does not point to any particular finding which it claims was not supported by the evidence. CAC merely claims that "there is no credible evidence that [Duke] experienced its claimed level of lost revenues or that the rate was established based on other financial aspects of the utility." Appellant's Br. pp. 34–35. It is expected that Duke's petition would not include actual losses as it was a petition seeking pre-approval of a three-year EE plan. The evidence indicated that the losses detailed in the petition were forecasted losses which would later be reconciled through EM&V with Duke's actual losses. The Commission's order accurately reflects this point and requires reconciliation. CAC also argues that the Commission failed to give appropriate weight to the evidence submitted by the Intervenors. As we have stated

---

[2] In addition, contrary to CAC's claim, the record reveals that the Commission did not ignore the evidence relating to the so-called "pancaking effect" argued by CAC.

[3] We are further unpersuaded by CAC's argument that the Commission erroneously relied on EM&V as part of the methodology for determining lost revenues given that Indiana Code section 8-1-8.5-10(o) explicitly provides that this method should be used during the reconciliation process.

numerous times above, we will not reweigh the evidence or reassess witness credibility on appeal. *See Ind. Gas*, 999 N.E.2d at 66.

## D.  Whether the Rate is Consistent with Indiana Code Section 8-1-8.5-10

[23]  CAC last argues that the lost revenue rate was not consistent with Indiana Code section 8-1-8.5-10.  In making this claim, CAC notes that the Commission did not reference or apply the procedures used in general rate-making cases.  However, as we have noted, the requirement that electricity providers file a three-year EE plan was adopted by our General Assembly in 2015 as a separate requirement that is in addition to long-standing requirements regarding general rate-making.  CAC points to no relevant authority indicating that the Commission was required to consider or apply procedures adopted in connection to general rate-making cases when considering a petition filed in accordance with Indiana Code section 8-1-8.5-10.  Instead, we think the Commission acted within its discretion by applying the factors and considerations listed in Indiana Code section 8-1-8.5-10 when considering Duke's proposed EE Plan.  CAC fails to establish that the Commission's order is not consistent with Indiana Code section 8-1-8.5-10.

# Conclusion

[24]  In sum, we conclude that the Commission did not abuse its discretion in finding both Duke's proposed EE goals and lost revenue rate to be reasonable.  As such, we affirm the Commission's approval of Duke's proposed EE Plan.

The judgment of the Commission is affirmed.

Bailey, J., and Mathias, J., concur.