

FILED

Apr 05 2017, 6:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Jennifer A. Washburn
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE –
INDIANAPOLIS POWER & LIGHT
COMPANY

Peter J. Rusthoven
Teresa Morton Nyhart
Jeffrey M. Peabody
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE –
INDIANAPOLIS POWER & LIGHT
INDUSTRIAL GROUP

Bette J. Dodd
Joseph P. Rompala
Lewis & Kappes, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE –
INDIANA UTILITY REGULATORY
COMMISSION

Curtis T. Hill, Jr.
Attorney General of Indiana

David Lee Steiner
Deputy Attorney General
Indianapolis, Indiana

Beth Krogel Roads
General Counsel
Indiana Utility Regulatory
Commission
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Citizens Action Coalition of Indiana, Inc., Indiana Association for Community and Economic Development, Indiana Coalition for Human Services, Indiana Community Action Association, Indiana State Conference of the National Association for the Advancement of Colored People, Inc., and National Association of Social Workers Indiana Chapter,

*Appellants (Intervenors Below),*

v.

Indianapolis Power & Light Company, et al.,

*Appellee (Petitioner and Parties Below).*

April 5, 2017

Court of Appeals Case No. 93A02-1604-EX-804

Appeal from the Indiana Utility Regulatory Commission

Cause Nos. 44576
              44602

The Hon. Carol Stephan, Chair

The Hon. James Huston
The Hon. Carolene Mays-Medley
The Hon. Angela Weber
The Hon. David E. Ziegner Commissioners

The Hon. Aaron Schmoll, Administrative Law Judge

**Bailey, Judge.**

# Case Summary

Indianapolis Power & Light Company ("IPL") petitioned the Indiana Utility Regulatory Commission ("the Commission") for approval of an increase to its base rates for provision of electricity, which had been in effect since 1995. The Commission granted requests for intervention by Citizens Action Coalition, Indiana Community Action Association, Indiana Coalition for Human Services, Indiana Association for Community Economic Development, National Association of Social Workers Indiana Chapter, and Indiana State Conference of the National Association for the Advancement of Colored People (collectively, "Joint Intervenors"), and by IPL Industrial Group ("IPL Group"), The Kroger Company, and the City of Indianapolis.[1] The proposed rate increase was approved by the Commission. After the denial of various petitions for reconsideration, Joint Intervenors appealed. We affirm. [2]

---

[1] The Indiana Office of the Utility Consumer Counselor ("the OUCC") is a statutory party to rate proceedings, as a consumer representative.

[2] By a separate order, we grant Joint Intervenors' motion to dismiss the Commission as a party to this appeal. Because the Commission acted as a fact-finding administrative tribunal and no statute or administrative provision expressly makes the Commission a party on appeal, it is not a proper party on appeal from its own decision. *See e.g., Citizens Action Coalition of Indiana, Inc. v. So. Indiana Gas & Electricity Co.*, 2017 WL 587261, slip op. at 1, n.1 (Ind. Ct. App. Feb. 14, 2017). *See also City of Terre Haute v. Terre Haute Water Works Corp.*, 180 N.E.2d 110, 111 (Ind. Ct. App. 1962) ("When there are two opposing parties before [the Public Service Commission of Indiana], as here, its action in making findings and issuing an order deemed detrimental by one of the parties is similar to that of a court which makes a decision determining a controversy between adverse parties. A court is never a party to an appeal from its decision.")

# Issue

Joint Intervenors articulate four issues claiming that the order lacks adequate support, particularly challenging (1) the lack of findings specifically addressing the impact of a particular rate component, a declining block rate ("DBR"), upon energy conservation, (2) the lack of findings specifically addressing the effect of DBR on elderly and African-American customers, (3) the rejection of a proposal for 25% low-income customer subsidies, and (4) the rejection of mandatory reporting by IPL of interruption-in-service data. We consolidate and restate the issues to conform to our standard of review, that is, a Commission order will stand unless no substantial evidence supports it or it is contrary to law,[3] and address the following issue: Whether the Commission's rate approval order is not conclusive and binding due to a lack of specific findings on factual determinations material to its ultimate conclusions.

# Facts and Procedural History

On December 29, 2014, IPL, an investor-owned public utility providing electrical service to approximately 470,000 ratepayers in and around Indianapolis, filed a base-rate-increase petition with the Commission. IPL proposed that the fixed customer charge, a flat fee for access to the electrical grid, would rise from $6.70 per month to $11.25 per month for customers using

---

[3] *Northern Ind. Public Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009).

0 to 325 kilowatt hours and from $11.00 to $17.00 for customers using over 325 kilowatt hours. The energy charge, a volumetric charge equal to the approved rate multiplied by the number of kilowatt hours consumed, would rise from $0.093346 to $0.093935 for the first 500 kilowatt hours and from $0.070346 to $0.073000 thereafter.[4] Because customers consuming greater than 500 kilowatt hours incrementally pay less than the lower-usage customers for the energy charge portion of the bill, the rate scheme incorporates a DBR.

[4] The Commission consolidated the base rate case with a facilities investigation case and conducted nine days of evidentiary hearings. At the hearing, Joint Intervenors opposed the increase to the monthly fixed customer charge and presented testimony opposing the DBR on grounds that charging less at higher usage rates penalizes low volume customers and does not promote energy conservation. Also, Joint Intervenors urged adoption of a 25% subsidy for certain customers, to be funded by an incremental usage increase on other customers, and requested an order that IPL provide Joint Intervenors with data on service interruption events pertaining to low-income customers.

[5] IPL presented testimony acknowledging that, in the absence of demand meters and/or time-of-use meters, the most cost-justified rate design would be a straight fixed-rate/variable rate. In this design, fixed rates are entirely

---

[4] The inclusion of fuel and Demand Side Management ("DSM") charges would cause a rise to $0.097416 from $0.096827 and to $0.076481 from $0.073827, for the first 500 kilowatt hours and over 500 kilowatt hours, respectively. There was also a third block reduced rate for residential users of electric hot water heaters and space heaters who consumed over 1,000 kilowatt hours per month.

recovered from the fixed charges and variable costs are entirely recovered from variable charges. However, IPL proposed gradualism as opposed to a total conversion to straight fixed-rate/variable rate methodology within one rate proceeding. Additionally, there was testimony that economically efficient pricing is achieved when a price is set equal to the marginal cost of production, and that flat energy charges (eliminating DBR) do not mirror costs in that it does not cost twice as much to produce twice as much electricity.

[6] Economist Glenn Watkins ("Watkins"), who testified for the OUCC after conducting an evaluation of IPL's proposal, opined that "the current level of customer charges is appropriate." (Tr. at 8208.) According to Watkins, the proposed increases to the fixed monthly customer charge "violate the regulatory principle of gradualism, violate the economic theory of efficient competitive pricing, and are contrary to effective conservation efforts." (Tr. at 8200.) With regard to DBR, Watkins recommended: "[DBR rates] be eliminated gradually to a flat rate structure. However, this restructuring of residential and small commercial rates should be done in a gradual and systematic manner to avoid rate shock to large volume heating customers." (Tr. at 8212.) He recommended a phase out in three rate cases, with equal increments.

[7] On March 16, 2016, the Commission issued its final order approving IPL's proposed rate increase and rejecting the proposals for a low-income customer subsidy and service interruption reporting requirements. We do not re-produce the eighty-three-page opinion here, but recite portions relevant to Joint Intervenor's positions:

*Evidence*. Joint Intervenors witness Howat recommended implementation of a low income rate that would be paid for by all classes of customers through a volumetric charge and that the low income rate be available to all residential customers at or below 150% of the poverty level. His recommendation was a 25% discounted rate. He also recommended a plan to implement a low-income arrearage write-down program by retiring pre-program arrearages through 12 timely payments of discounted bills. He conducted and submitted analysis for the Commission's consideration of the account activity among Low Income Home Energy Assistance program ("LIHEAP") customers – number of overdue accounts, disconnect notices, and disconnection for nonpayment. Joint Intervenor witness Fraser presented demographic data concerning income levels and poverty rates in Indiana and Marion County.

Industrial Group witness Phillips contended that recovery of social program costs is divorced from any cost causation principles and distorts electric price signals. He testified that the proposed program is best addressed by the Indiana state legislature.

In rebuttal, IPL witness Gaske testified that the Joint Intervenors' proposal raises significant policy issues for the Commission to address and that perhaps the manner and amount of low income assistance would be more appropriately addressed in a generic proceeding involving all regulated electric utilities or by the legislature.

*Discussion and Findings*. We recognize the importance of the issues raised by Joint Intervenors, but find that there are numerous implementation and policy related concerns. The timing of the introduction of the proposal in this proceeding has

not provided an opportunity for sufficient consideration of the complexities involved. As pointed out by Mr. Phillips, the application of costs that could be considered beyond the cost of electric service distorts electric service price signals. A well-designed proposal would include a thorough understanding of how it would create or alleviate any costs of providing electric service. Further, access to key demographic and billing information the affected utility or utilities collect and hold is integral to evaluating any specific program design. Absent this information, we decline to adopt Mr. Howat's recommendations in this proceeding.

Joint Intervenors also have proposed that IPL be ordered to collect and report trend data on arrearages, disconnections, and related data points. While a properly designed program of the type suggested by Joint Intervenors would benefit from this information, and we encourage IPL to consider working with the Joint Intervenors and other interested stakeholders in further identifying beneficial information, we decline to order such collection and reporting solely on the basis of the evidence before us. We believe that any such effort is best pursued by the utility and interested stakeholders outside the regulatory constraints of a specific Commission directive.

*Rate Design.*

*Evidence.* Dr. Gaske explained that the rate design objective was guided by two goals: (1) the residential increase would remain less than 10%; and (2) no rate schedule would receive a rate decrease. The rate design proposed for residential and commercial rate classes by Dr. Gaske included moving additional fixed costs into the customer charge component of the bill. The result is a customer charge that increases by a greater percentage than the overall rate increase. He explained that the proposed level does not include all the fixed costs. In conducting the revenue proof, Dr. Gaske gave effect to the movement of

customers who are eligible to migrate to a different rate schedule that would be more financially advantageous to them. He testified that after this case is concluded, IPL will notify those customers who would achieve lower bills by moving to a different rate schedule. The effect of this migration will result in the new rate schedule producing $1.187 million less in revenue, which was added to the overall rate increase requested.

OUCC witness Watkins objected to the increase to the residential customer charge. He testified that it violates gradualism, violates efficient competitive pricing, and discourages conservation. Mr. Watkins also opposed Dr. Gaske's proposed migration adjustment.[5] The migration adjustment was based upon an analysis of customers and a determination that a number of the customers would be financially benefitted if they migrated to an alternative rate schedule. Mr. Watkins claimed that one cannot assume that a customer will choose to move to a more economical rate. He noted that savings for most would be less than 10%.

. . .

Joint Intervenor witness Howat also objected to the increase to the customer charge and continuation of declining block rates. He testified that rate structures such as these have a disproportionate impact on low income, elderly, and African American customers, and that on average, low income customers use less electricity than the average or than their higher income counterparts.

Industrial Group witness Phillips objected to the proposed increase in the demand charge for the HL class. . . . Kroger

---

[5] Migration refers to movement between an SS (energy only) rate and SL (demand plus energy) rate.

witness Higgins testified that he supports IPL's proposed rate design, including the increases to the demand charge for the HL and SL classes. City witness Sommer disagreed with IPL's rate migration objective that no class receive a rate decrease. . . .

In rebuttal, Dr. Gaske responded to Mr. Watkins' testimony concerning economic efficiency and testified that economic theory supports the concept that economic efficiency is promoted by recovering fixed costs through a fixed charge and only variable costs in a variable charge. He noted that IPL is not proposing a straight fixed variable ("SFV") rate design in this case. He testified that while a SFV rate design would provide better price signals, IPL's proposed rates would continue to recover 75% of residential fixed costs through the energy charge and 81% of small commercial fixed costs. He agreed that declining block rates are not as cost-justified as a SFV rate design, but are more cost-justified than a flat energy charge in that the declining block rate structure represents a reasonable compromise approach in which successively larger rate blocks move closer to the marginal cost of energy. He further responded to Mr. Watkins' contention that the increase in the customer charge violates a principle of gradualism by noting that gradualism looks at the total bill, which is the sum of both the customer and energy charges. The proposed increase in customer charge would significantly reduce the percentage increase in energy charge that would otherwise be required and thereby offset the increase in the customer charge which is the focus of Mr. Watkins' argument.

With respect to the Joint Intervenors' position, Dr. Gaske cited details concerning the percentage of residential customers who are enrolled in the LIHEAP program and those who are not, showing that, in general, the energy usage characteristics among the residential class for LIHEAP customers are very similar to the no-assistance customers. As a result, proposals for lower customer charges and/or flat energy charges are likely to increase

the monthly bills of the significant portion of low income energy assistance customers who have above-average energy use, and reduce the bills of the significant portion of customers who are not low income but have below-average energy use.

. . .

*Discussion and Findings.*

*Increase in Residential Customer Charge and Continuation of Declining Block Rates.* There were only two arguments presented in opposition to IPL's customer charge proposal: Mr. Watkins' contention that all costs are variable in the long run and therefore SFV rates represent inefficient pricing, and Mr. Howat's testimony that Petitioner's rate design produces a disproportionate impact on low income customers.

As to the first argument, we note that IPL has not proposed SFV rates. While the proposed increases in the customer charge from $6.70 to $11.25 (for less than 325 kWh/month) and $11.00 to $17.00 (for greater than 325 kWh/month) move toward a more fixed and variable rate design consistent with traditional cost causation principals, it is demonstrably short of SFV rates. There is no evidence that the customer charge as designed even reaches the level of full distribution system fixed cost recovery. Cost recovery design alignment with cost causation principles sends efficient price signals to customers, allowing customers to make informed decisions regarding their consumption of the service being provided. The Commission investigated the rate design issue with regard to natural gas service in Cause No. 43180, and the general premise appears to be reasonably applicable to electric utilities in the context of distribution-related costs. Notwithstanding, gradualism in any movement is a reasonable consideration, and we find that the increase in customer charge is consistent with the Commission's preference for gradual changes

in rate structures.  We note that IPL's proposed customer charge represents the first increase in the customer charge since base rates were last changed in 1995.

With respect to the second argument, Dr. Gaske's analysis demonstrated that approximately 8-10% of the customers within each residential class receive energy assistance, yet the median usage and the 90th percentile usage for energy assistance customers compared to no-assistance customers is similar.  While switching to an inclining block rate structure may benefit low income/low energy users, it would harm a substantial number of low income/high energy users.  Many low-income customers use more than the residential average amount.

Ultimately, we find that Petitioner's proposed rate design to increase the customer charge and maintain declining block rates should be approved.  We further find that this structure does not violate principles of gradualism, because gradualism is best considered in the context of the entire customer bill and not discrete charges within the bill.

(App. at 91-96.)

[8] The Commission subsequently issued a Nunc Pro Tunc Order unrelated to this appeal.  On April 5, 2015, Joint Intervenors, IPL Group, and The Kroger Company filed petitions seeking reconsideration of various aspects of the Order. On June 1, 2016, the Commission denied those petitions.  Joint Intervenors and the OUCC filed notices of appeal.  Subsequently, the OUCC filed a motion to

dismiss its notice of appeal.[6] The appeal initiated by Joint Intervenors proceeded.

## Standard of Review

[9] The Commission was created by the Indiana General Assembly to act "primarily as a fact-finding body with the technical expertise to administer the regulatory scheme designed by the legislature." *Northern Ind. Public Serv. v. U.S. Steel*, 907 N.E.2d 1012, 1015 (Ind. 2009). The Commission was assigned the responsibility "to insure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana." *Id.* The Commission can exercise only that power which has been conferred upon it by statute. *Id.*

[10] This statutory scheme reflects a basic legislative policy that questions of rate-making methodology are best consigned to the Commission's expertise. *L.S. Ayres & Co. et al. v. IPALCO et al.*, 169 Ind. App. 652, 675-76, 351 N.E.2d 814, 830 (1976). In each rate proceeding, the Commission's primary objective is to establish a level of rates and charges that will permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. *City of Evansville v. Southern Ind. Gas & Elec. Co.*, 167 Ind. App. 472, 479, 339 N.E.2d 562, 568 (1976).

---

[6] The OUCC petitioned to be retained as a statutory party on appeal. This Court granted that motion on August 4, 2016.

[11]     Indiana Code Section 8-1-3-1 provides for judicial review of the Commission's decisions in language almost identical to provisions for judicial review of other administrative agency actions:

> Any person, firm, association, corporation, limited liability company, city, town or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases. An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

[12]     Our review is two-tiered:

> On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. *Citizens Action Coalition of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 612 (Ind. 1985). Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it. *McClain* [*v. Review Bd. Of Ind. Dept. of Workforce Dev.,* 693 N.E.2d 1314, 1317-18 (Ind. 1998)]. In substantial evidence review, "the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most favorable to the Board's findings." *Id.* The Commission's order is conclusive and binding unless (1) the evidence on which the Commission based

its findings was devoid of probative value; (2) the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; (3) the result of the hearing before the Commission was substantially influenced by improper considerations; (4) there was not substantial evidence supporting the findings of the Commission; (5) the order of the Commission is fraudulent, unreasonable, or arbitrary. *Id.* at 1317 n.2. This list of exceptions is not exclusive. *Id.*

At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. *Citizens Action Coalition*, 485 N.E.2d at 612. *McClain* described the judicial task on this score as reviewing conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. *McClain*, 693 N.E.2d at 1317-18. Insofar as the order involves a subject within the Commission's special competence, courts should give it greater deference. *Id.* at 1318. If the subject is outside the Commission's expertise, courts give it less deference. *Id.* In either case courts may examine the logic of inferences drawn and any rule of law that may drive the result. *Id.* Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standard and legal principles involved in producing its decision, ruling, or order. *Citizens Action Coalition*, 485 N.E.2d at 612-13.

*Northern Indiana Public Serv.*, 907 N.E.2d at 1016.

## Declining Block Rates – Disparate Impact

[13] At the hearing, Joint Intervenors opposed a rate scheme inclusive of DBR, that is, the volumetric charge decrease from $0.093935 to $0.070346 after the first

500 kilowatt hours of usage. Joint Intervenors argued that this is a disincentive for conservation and disproportionately harms elderly, African-American, and low income customers.

[14]     In response to an inquiry about the "general public policy" applicable to DBR, Watkins testified:

> In 1978, Congress passed the Public Utility Regulatory Policies Act ("PURPA"). Among other things, PURPA established various conservation initiatives and mandates for electric utilities. Included in this Act is a clear policy to eliminate declining-block energy rates unless supported by costs. Specifically, PURPA states:

> 'Declining Block Rates. The energy component of a rate, or the amount attributable to the energy component in a rate, charged by any electric utility for providing electric service during any period to any class of electric consumers may not decrease as kilowatt-hour consumption by such class increases during such period except to the extent that such utility demonstrates that the costs to such utility or providing electric service to such class, which costs are attributable to such energy component, decrease as such consumption increases during such period.'

> Since this time, most states and commissions have abandoned the once prevalent declining-block rate structures in favor of flat, or inverted, block rates. The general policy supporting the elimination of such declining-block rates is that this type of rate structure is clearly at odds with energy conservation due to the fact that the incremental price of electricity decreases as consumption increases, thereby creating somewhat of an incentive to use more and more electricity. Indeed, declining-block electricity rates became popular in the 1960s and early 1970s and were used as a promotional tool to encourage the

increased usage of relatively cheap electricity during a time in which there were significant natural gas shortages through the Country.

(Tr. at 8210.)

[15] On appeal, Joint Intervenors claim that the Commission's order "is deficient because the Commission failed to make basic findings of fact or a conclusion of law as to whether DBR has a deleterious effect on energy conservation and energy efficiency programs sponsored by the utility." Appellant's Br. at 25. According to Joint Intervenors, the Commission "ignored the substantial evidence presented by both CAC and the OUCC, demonstrating that 'this type of structure is clearly at odds with energy conservation due to the fact that the incremental price of electricity decreases as consumption increases, thereby creating somewhat of an incentive to use more and more electricity.'" Appellant's Br. at 27 (quoting App. at 190-91). They ask that we remand the order "for the Commission to determine whether the DBR rate structure is deleterious to energy conservation and utility-sponsored energy efficiency programs." Appellant's Br. at 30.

[16] We do not find this particular relief warranted. Joint Intervenors did not bring a declaratory judgment action; rather, they intervened in a rate case. Rate-making is a legislative as opposed to a judicial function, and our Indiana Legislature has seen fit to establish a commission for the express purpose of hearing evidence and balancing and weighing the many complicated factors which must be taken into consideration in setting utility rates. *State ex rel.*

*Indianapolis Water Co. v. Boone Circuit Court*, 261 Ind. 583, 586-87, 307 N.E.2d 870, 872 (1974). The enabling act does not authorize the Commission to issue declaratory rulings. *See U.S. Steel Corp. v. No. Ind. Public Serv. Co., Inc.*, 482 N.E.2d 501, 506 (Ind. Ct. App. 1985), *trans. denied.*

[17] In their insistence upon particular language, Joint Intervenors attempt to shift the focus from the reasonableness of the order approving the rate change as a whole to one component. As the Commission acknowledged, an ideal rate scheme would closely align recovery of fixed costs with fixed rates and variable costs with variable rates based upon usage. However, there was ample testimony to support the Commission's conclusions that, in light of the fact that IPL's base rates had not been increased since 1995, an abrupt rate structure overhaul ignoring the principles of gradualism would be undesirable. Ultimately, the Commission incorporated the principle of "gradualism," (App. at 96), and approved a rate structure that was not a straight fixed rate/variable rate structure.

[18] Joint Intervenors make a cursory claim that "approval of DBR despite its deleterious effect on energy conservation is contrary to federal law, state rule, and existing precedent." Appellant's Br. at 27. They note that the National Energy Policy Act of 1992 encourages state regulators of utilities to consider setting rates to promote energy efficient investments. They also note that, in a separate utility case, the Commission found the utility's proposal to gradually eliminate DBR rates to be reasonable. *See In re Verified Petition of So. Ind. Gas & Electric Co.,* Cause No. 43839, 2011 Ind. PUC LEXIS 115, 215 (I.U.R.C. Apr.

27, 2011). The parties do not dispute the proposition that public policy, federal and State, favors and encourages conservation.

[19] Nonetheless, encouragement is not a mandate. Joint Intervenors direct us to no statutory requirement that each individual component of a rate scheme reflect the most environmentally conservative approach or that abandonment of older methodology be immediate and total. At bottom, Joint Intervenors suggest a reweighing of evidence, with conservation – based upon their interpretation of customer usage signals – being paramount. They do not demonstrate the unreasonableness of the rate increase as a whole.

[20] In a similar vein, Joint Intervenors argue that the Commission "did not make any specific findings of fact or make an ultimate finding of reasonableness as to the material issue raised regarding whether the continuance of the DBR structure disproportionately harms elderly consumers and African American consumers." Appellant's Br. at 31. Joint Intervenors observe that the Commission has a duty to see that the rates are fair and reasonable, both to the consumers and to the utility; claim that "no party rebutted the [Joint Intervenor] evidence on this issue"; and ask for remand "to determine whether the DBR rate structure disproportionately harms elderly and African American ratepayers." Appellant's Br. at 31-32.

[21]     Joint Intervenors presented testimony to the effect that lower income customers use less electricity on average.[7] IPL presented testimony that their customers participating in energy assistance programs show similar characteristics of usage compared to customers not receiving assistance, looking at median usage and 90th percentile usage. Even assuming that DBR has a disproportionate negative impact upon certain groups of customers, the Commission is required by statute to approve rates that are fair and reasonable inclusive of the entire customer base. There is no statutory requirement that the impact upon particular sub-groups be separately addressed. Joint Intervenors have not demonstrated that the Commission failed to conform to statutory standards.

[22]     "On matters within its jurisdiction, the Commission enjoys wide discretion. The Commission's findings and decision will not be lightly overridden just because we might reach a contrary opinion on the same evidence." *NIPSCO Indus. Grp. v. No. Ind. Public Serv. Co.*, 31 N.E.3d 1, 5-6 (Ind. Ct. App. 2015) (internal citation omitted.) As explained by Watkins, "it is generally accepted that to the extent possible, joint costs should be allocated to customer classes based on the concept of cost causation," but "although there are certain principles used by all cost of service analysts, there are often significant disagreements on the specific factors that drive individual costs." (Tr. at 8147-48.)

---

[7] The data base was not limited to IPL or Indiana customers.

Challengers have the burden of showing there is insufficient evidence in the record to support the findings of the Commission; they cannot merely cite to other evidence of record which would support a determination more favorable to their position. *Bethlehem Steel Corp. v. N. Ind. Pub. Serv. Co.*, 397 N.E.2d 623, 628 (Ind. Ct. App. 1979). Here, the findings contain enough detail such that we can determine whether the order is reasonable, within the wide discretion of the Commission.

## Subsidy Program and Reporting Requirements

Joint Intervenors complain that the Commission did not make sufficient findings to support its rejection of Joint Intervenors' requests for a 25% subsidy to low-income customers and for mandatory reporting of service interruption events so as to assist the Intervenors in supporting future arguments with such data. As a threshold matter, we observe that Joint Intervenors argue that the Commission must make findings with respect to disparate socioeconomic impact of rate increases, but have not shown that the Commission had a statutory duty to make any findings at all in this regard. Joint Intervenors were permitted to intervene in a rate-making case, but this did not change the nature of the proceeding from rate-making to a broad socio-economic inquiry akin to that which might be undertaken by the General Assembly.

The Commission is to approve rates that are just and reasonable. Within the statutory language, there is no requirement that the unique position of particular groups of consumers be separately considered. Joint Intervenors are

not entitled to specific findings on propositions they have injected unless it is a matter material to the rate decision. *Citizens Action Coalition*, 485 N.E.2d at 612. In other words, the Commission does not have to justify to Joint Intervenors why it rejected a subsidy outside general rate-making principles and a reporting obligation. Joint Intervenors had to justify to the Commission why a direct subsidy and reporting requirement should be adopted within a rate case. They failed to do so.

[26] That said, the Commission has shown some inclination to hear socio-economic evidence in a rate case. It did not simply ignore the Joint Intervenors' argument. Rather, after hearing limited evidence, the Commission acknowledged the need for broader-based evidence and observed that the legislature is better suited to determinations of if and when one citizen is burdened to benefit another. Undeniably, lower income persons at times struggle to obtain basic necessities. But the struggle for necessities of life is broader; what of those who have above-poverty incomes but increased expenses, a larger family size, or significant medical needs? The drawing of lines in the face of myriad considerations and competing concerns is traditionally a function performed by our General Assembly. *See Citizens Action Coalition v. Public Serv. Co.*, 450 N.E.2d 98, 103 (Ind. Ct. App. 1983) (affirming the Commission decision declining to require Indiana electric utilities to offer a "life-line" rate structure providing a below-cost rate for essential residential customer needs and observing, "any decision to implement an assistance

program not based on sound regulatory principles must be made by the legislature.")[8]

[27] Again, Joint Intervenors have not shown that the Commission failed to conform to statutory standards or failed to make requisite findings.

# Conclusion

[28] Joint Intervenors have not shown that the Commission decision approving a rate design that includes DBR is unsupported by requisite findings. Joint Intervenors have not shown that the rate approval order is non-binding due to a lack of more extensive factual findings on matters introduced by Joint Intervenors which were not directly material to components of the approved rate design.

[29] Affirmed.

Najam, J., and May, J., concur.

---

[8] In the order affirmed on appeal, the Commission found that a rate "targeted" to specific income or demographic groups of residential customers was prohibited by law and a general lifeline rate structure was not an effective and equitable means of providing assistance to low-income residential customers. *Citizens Action Coalition*, 450 N.E.2d at 100.