

**FILED**

Sep 28 2017, 10:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

FOR APPELLANT

Randolph L. Seger
Brian W. Welch
Michael T. Griffiths
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

William Fine
Daniel M. LeVay
Scott C. Franson
Abby Gray
Indiana Office of Utility Consumer
Counselor
Indianapolis, Indiana

Beth E. Heline
Jeremy Comeau
Patricia C. McMath
Indiana Utility Regulatory
Commission
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Hamilton Southeastern Utilities,
Inc.,

*Appellant-Petitioner,*

v.

Indiana Utility Regulatory
Commission; Indiana Office of
Utility Consumer Counselor;
and Apartment Association of
Indiana, Inc.,

*Appellees-Respondents/Statutory
Parties and Intervenors.*

September 28, 2017

Court of Appeals Case No.
93A02-1612-EX-2742

Appeal from the Indiana Utility
Regulatory Commission

The Honorable Aaron A. Schmoll,
Senior Administrative Law Judge

Trial Court Cause No. 44683

**Riley, Judge**

# STATEMENT OF THE CASE

Appellant/Cross-Appellee-Petitioner, Hamilton Southeastern Utilities, Inc. (HSE), appeals the Order of the Indiana Utility Regulatory Commission (Commission), in which the Commission authorized a 1.17% increase in HSE's rate for sewer utility service.

We affirm in part, reverse in part, and remand.

# ISSUES

HSE raises six issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the Commission erred by excluding certain expenses from the calculation of HSE's utility rate; and

(2) Whether the Commission erred by approving an excessive system development charge in one of HSE's service areas.

On cross-appeal, Appellee/Cross-Appellant-Respondent, the Indiana Office of Utility Consumer Counselor (OUCC), raises one additional issue, which we restate as: Whether the Commission erred by including income tax liability in its calculation of HSE's utility rate.

# FACTS AND PROCEDURAL HISTORY

HSE was founded in 1988 and is a for-profit public utility that provides "sewage collections and treatment services." (HSE Exh. 4—Non-Conf. Exh. Vol. II, p.

5).  HSE "is the largest investor owned sewer utility in" Indiana and currently serves more than 20,000 customers in Hamilton County, Indiana.  (OUCC Exh. 2—Non-Conf. Exh. Vol. IV, p. 57).  As a public utility, HSE is subject to regulation by the Commission.

[6]     Since its inception, HSE has relied on an affiliate company, Sanitary Management & Engineering Company, Inc. (SAMCO), to carry out the operation, maintenance, and engineering functions of HSE's sewage operations.  HSE and SAMCO are governed by the same set of board members and have the same shareholders.  HSE itself has only seven full-time employees to perform management and billing tasks.  HSE and SAMCO operate pursuant to a Utility Services Agreement, which has been filed with the Commission as required by statute for affiliate contracts.  Under the Utility Services Agreement, SAMCO bills HSE an hourly rate for services, which rates are annually negotiated by HSE and SAMCO.  The Utility Services Agreement also provides that SAMCO is entitled to a 10% management fee for procuring equipment, supplies, and subcontractors on behalf of HSE.  In addition to HSE, SAMCO services nineteen other clients.  However, maintaining and operating HSE's sewage system comprises approximately 50% to 60% of SAMCO's business, and some SAMCO employees spend all of their time working on HSE's system.

[7]     In a 2010 rate case, the Commission authorized HSE to charge a flat monthly rate of $34.63 per single family equivalent dwelling unit (EDU).  In establishing this rate, the Commission approved a 9.8% rate of return for HSE.  At some point, largely due to aging equipment, HSE began to experience "operational

issues" that resulted in significant increased maintenance and operating expenses. (HSE Exh. 4—Non. Conf. Exh. Vol. II, p. 9). In 2013, a sewage overflow situation necessitated involvement by the Indiana Department of Environmental Management (IDEM). As a result, HSE entered into an agreed order with IDEM, which required HSE to implement a maintenance and operation plan for its entire system. Since the establishment of its current rates, HSE has expended "more than $11 million on system repairs and maintenance." (HSE Exh. 4—Non-Conf. Exh. Vol. II, p. 8). In order "to ensure a safe and reliable system," HSE anticipates that the increased maintenance and operating costs will continue for the foreseeable future. (HSE Exh. 4—Non-Conf. Exh. Vol. II, p. 10).

[8] Because of the added expenses, HSE "achieved an average rate of return of just 1.9%" between 2009 and 2015, even though the Commission had approved a 9.8% rate of return. (HSE Exh. 4—Non-Conf. Exh. Vol. II, p. 10). Accordingly, on September 24, 2015, under Cause No. 44683, HSE filed a Verified Petition and Notice of Intent to File in Accordance with Minimum Standard Filing Requirements, seeking authority from the Commission "to increase its rates and charges for the sewage disposal utility service it renders to the public and for other related relief." (Appellant's App. Vol. II, p. 36). Specifically, HSE sought an across-the-board rate increase of 8.42% to produce additional revenues of $997,041 per year. This increase would amount to a monthly rate increase of $2.92 per EDU, for a monthly wastewater treatment bill of $37.55 per EDU.

[9] HSE also requested, in relevant part, an increase to its system development charge (SDC) of $450 in all of its service areas. "All new development pays $2,400 [or $3,200 in the Flatfork Creek area, which is subject to an additional surcharge,] per EDU" to help fund the costs of capital projects. (HSE Exh. 3—Non-Conf. Exh. Vol. I, p. 172). Thus, HSE requested the approval of a $2,850 SDC for all areas except Flatfork Creek, where it requested an SDC of $3,650. "SDCs provide a reasonable means of ensuring that existing retail customers do not subsidize the cost of new development." (HSE Exh. 3—Non-Conf. Exh. Vol. I, p. 173). A portion of each SDC that HSE collects is also paid to either the City of Fishers or the City of Noblesville for a wastewater treatment plant capacity fee.[1]

[10] On February 24, 2016, the Commission conducted a hearing. HSE presented evidence from various accounting/utility experts, as well as the president of the company, to support its proposed rate increase. In response, the OUCC, which is a state agency that represents the interests of "ratepayers, consumers, and the public" in utility matters, presented its own calculations and requested that the Commission decrease HSE's existing rates by 14.01%. Ind. Code §§ 8-1-1.1-4, -5.1(e). While the OUCC agreed with some of HSE's proposed adjustments, it advocated for a rate reduction based on, in large part, its belief that HSE could operate more economically by eliminating its relationship with SAMCO in lieu

---

[1] In its petition for a rate increase, HSE also sought authority to charge a monthly fee for its new FOG (fats, oils, and grease) management rules, as well as other miscellaneous changes to its tariff. However, the Commission's decisions on these issues are not before us on appeal.

of performing those necessary tasks with in-house employees. After reaching certain stipulations with the OUCC, HSE ultimately reduced its requested rate increase to 6.27%.

[11] On November 9, 2016, the Commission issued its Order, authorizing HSE "to increase its rates and charges for sewer utility service by 1.17%, or $139,305." (Appellant's App. Vol. II, p. 34). According to the Commission, such an increase would result in a monthly charge to customers of $35.04 per EDU and would provide a 9.60% rate of return to HSE. In relevant part, the Commission based its rate determination on a finding that expenses related to SAMCO should be eliminated from HSE's working capital allowance; the Commission also declined to include SAMCO's 10% management fee and a 3% increase to SAMCO's contracted operating costs. However, contrary to the proposal advanced by the OUCC, the Commission determined that HSE could recover its income tax liability (which is passed through to and paid by its shareholders) in its rates. As to HSE's request regarding its SDC, the Commission approved a $450 increase for all service areas.

[12] On November 29, 2016, HSE filed a Petition for Reconsideration and Clarification. However, rather than waiting for the Commission to rule on this petition, on December 9, 2016, HSE filed a Notice of Appeal. The Commission never ruled on HSE's reconsideration petition prior to this court

assuming jurisdiction. HSE now appeals, and the OUCC cross-appeals. Additional facts will be provided as necessary.[2]

# DISCUSSION AND DECISION

### I. *Motion to Dismiss*

In its Notice of Appeal, HSE identified the Commission as an appellee/statutory party. However, on May 9, 2017, HSE filed a motion to dismiss the Commission from this appeal, clarifying that it had "mistakenly identified the Commission as a party on appeal." (HSE's Motion to Dismiss, p. 4). HSE argued that the Commission was an improper party as it "acted as a fact-finding administrative tribunal, hearing evidence from the opposing parties, and rendering its Order purportedly based on the evidence." (HSE's Motion to Dismiss, p. 2).

Nevertheless, on June 9, 2017, the Commission filed an appellate brief, in which it responded to HSE's claims of error and argued that the findings of its final Order were justified. In response to HSE's motion to have it dismissed as a party to the appeal, the Commission contended that it is a proper party because this "case is not akin to a controversy between two parties." (Commission's Br. p. 16). Rather, the Commission claimed to have been acting

---

[2] On December 30, 2015, by order of the Commission, the Indiana Apartment Association, "a statewide trade organization" that represents the interests of several "multi-family housing units within HSE's service territory," intervened in the proceeding. (Appellant's App. Vol. II, p. 47). The Apartment Association challenged HSE's billing methodologies with respect to multi-family housing units; however, the Commission ultimately found HSE's billing practices to be reasonable in this regard. The Apartment Association does not participate in this appeal.

in a legislative, not judicial, capacity in determining a proper utility rate. Thus, the Commission asserted that

> as an executive branch administrative agency acting in the public interest[,] [it] should be able to defend that its orders are in the public interest. It therefore brings a perspective useful to the Court of Appeals that may be helpful to proper resolution of the issues on this appeal and should be allowed to remain as an appellee.

(Commission's Br. p. 18).

[15] "The Indiana General Assembly created the [Commission] primarily as an impartial fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." *Duke Energy Ind., Inc. v. Office of Util. Consumer Counselor*, 983 N.E.2d 160, 164 (Ind. Ct. App. 2012) (citing I.C. § 8-1-1-5(a)). "The Commission cannot act in the role either of a proponent or opponent on any issue to be decided by it." *Id.* (citing I.C. § 8-1-1-5(a)). Rather, the Commission's role "is to ensure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana." *Id.*

[16] In *City of Terre Haute v. Terre Haute Water Works Corp.*, 180 N.E.2d 110, 111 (Ind. App. 1962), *In Banc*, this court held that it was improper to name the Commission as a party to the appeal on a rate-making decision it had rendered. The *Terre Haute* court stated that the Commission

> is a fact-finding administrative tribunal which acts in a quasi-judicial capacity. When there are two opposing parties before it, as here, its action in making findings and issuing an order

deemed detrimental by one of the parties is similar to that of a court which makes a decision determining a controversy between adverse parties. A court is never a party to an appeal from its decision.

*Id.* More recently, in *Citizens Action Coal. of Ind., Inc. v. Indianapolis Power & Light Co.*, 74 N.E.3d 554, 557 n.2 (Ind. Ct. App. 2017), our court granted a motion to dismiss the Commission as a party on appeal, stating that "[b]ecause the Commission acted as a fact-finding administrative tribunal and no statute or administrative provision expressly makes the Commission a party on appeal, it is not a proper party on appeal from its own decision."

[17] The Commission cites two cases in support of its contention that this court has previously allowed the Commission to participate as a party in judicial review of the Commission's own orders. *See NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 31 N.E.3d 1 (Ind. Ct. App. 2015), and *Duke Energy Ind. Inc.*, 983 N.E.2d at 160.[3] Although the Commission was a named party in these appeals, these decisions did not address the merits of whether the Commission was a proper appellate party and, thus, offer little value to the Commission's position.

[18] The Commission further contends that the present rate case did not involve "a controversy between two adverse parties." (Commission's Br. p. 17). Specifically, the Commission asserts that the OUCC cannot be considered an

---

[3] The Commission cites a third case, *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 804 N.E.2d 289 (Ind. Ct. App. 2004); however, we see nothing to indicate that the Commission appeared as a party in that appeal.

adverse party because it agreed with HSE "on a number of issues." (Commission's Br. p. 17). Moreover, the Commission points out that it would have had to consider and rule on HSE's rate request regardless of whether the OUCC had posed any opposition; thus, "it is not accurate to consider a rate case before an administrative body the same as a complaint or petition of one party against another." (Commission's Br. p. 17).

[19] We recognize that the Commission acts in a legislative, rather than judicial, capacity with respect to rate-making, and the General Assembly "has seen fit to establish a [C]omission for the express purpose of hearing evidence and balancing and weighing the many complicated factors which must be taken into consideration in setting utility rates." *Citizens Action Coal. of Ind., Inc.*, 74 N.E.3d at 564. Nevertheless, the Commission is obligated to be "an impartial fact-finding body" in "all controversial proceedings heard by it." I.C. § 8-1-1-5(a). Here, HSE sought an initial rate increase of 8.42%, which it subsequently agreed to reduce to 6.27%, whereas the OUCC presented evidence in an effort to convince the Commission to decrease HSE's existing rates by 14.01%. Additionally, the Indiana Apartment Association appeared as an intervenor to challenge HSE's billing practices with respect to multi-family housing units in HSE's service area. Although the Commission wields wide discretion in determining an appropriate rate, it cannot be said that the parties appearing before the Commission did not advocate for competing interests. Furthermore, we find that the Commission's Order should speak for itself, without the need

to further rationalize its decision to our court. Accordingly, the Commission is not a proper party on appeal from its own decision and should be dismissed.[4]

## II. *Standard of Review*

Judicial review of the Commission's decisions is governed by Indiana Code section 8-1-3-1, which provides that

> [a]ny person, firm, association, corporation, limited liability company, city, town or public utility adversely affected by any final decision, ruling, or order of the [C]ommission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases. An assignment of errors that the decision, ruling, or order of the [C]ommission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

More specifically, our review is two-tiered:

> On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence

---

[4] A separate order granting HSE's motion to dismiss the Commission as a party to this appeal will be issued simultaneously with this decision.

supports it. In substantial evidence review, "the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most favorable to the [Commission's] findings." The Commission's order is conclusive and binding unless (1) the evidence on which the Commission based its findings was devoid of probative value; (2) the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; (3) the result of the hearing before the Commission was substantially influenced by improper considerations; (4) there was not substantial evidence supporting the findings of the Commission; (5) the order of the Commission is fraudulent, unreasonable, or arbitrary. This list of exceptions is not exclusive.

At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. *McClain* [*v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1317-18 (Ind. 1998),] described the judicial task on this score as reviewing conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. Insofar as the order involves a subject within the Commission's special competence, courts should give it greater deference. If the subject is outside the Commission's expertise, courts give it less deference. In either case[,] courts may examine the logic of inferences drawn and any rule of law that may drive the result. Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standard and legal principles involved in producing its decision, ruling, or order.

*Citizens Action Coalition of Ind., Inc.*, 74 N.E.3d at 562-63 (internal citations omitted) (quoting *N. Ind. Pub. Serv. v. U.S. Steel*, 907 N.E.2d 1012, 1016 (Ind. 2009)).

[22] The Commission's "authority 'includes implicit powers necessary to effectuate the statutory regulatory scheme.'" *United States Gypsum, Inc. v. Ind. Gas Co.*, 735 N.E.2d 790, 795 (Ind. 2000) (quoting *Office of Util. Consumer Counselor v. Pub. Serv. Co.*, 608 N.E.2d 1362, 1363-64 (Ind. 1993)). As a legislative creation, the Commission is limited to exercising "that power which has been conferred upon it by statute." *Citizens Action Coal. of Ind., Inc.*, 74 N.E.3d at 562. With respect to matters within its jurisdiction, it is well established that the Commission "enjoys wide discretion." *Id.* at 565. We will not override the Commission's findings and decision simply "because we might reach a contrary opinion on the same evidence." *Id.* The party challenging the Commission's decision bears the burden of showing there is insufficient evidence in the record to support the Commission's findings; it is not enough to "merely cite to other evidence of record which would support a determination more favorable to their position." *Id.* at 565-66.

### III. *Utility Rate Determination*

[23] It is a well-established "basic legislative policy that questions of rate-making methodology are best consigned to the Commission's expertise." *Id.* at 562. In rate cases, "the Commission's primary objective is to establish a level of rates and charges that will permit the utility to meet its operating expenses plus a return on investment which will compensate its investors." *Id.* "In determining

fair rates, the Commission considers a representative level of anticipated revenues and expenses and the property employed by the utility to provide service to its customers." *United States Gypsum, Inc.*, 735 N.E.2d at 798. When the Commission "determines that a utility's rates have become unjust and unreasonable, it may modify them by ordering just and reasonable rates to be charged prospectively." *Id.* Because the "rate-setting procedure is comprehensive[,] the Commission must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years." *Id.* (internal quotation marks omitted).

## A. *SAMCO Fees*

[24] HSE first challenges the Commission's exclusion of certain SAMCO-related expenses from its rate calculation. In August of 2015, HSE and SAMCO negotiated a 3% increase to SAMCO's contracted billing rates, and the affiliate Utility Services Agreement entitles SAMCO to a 10% management fee for procuring materials and subcontractors. In its Order, the Commission determined that HSE was not permitted to recover either the 3% contract increase or the 10% management fee through its utility rate. Specifically, the Commission found:

> As noted by the OUCC, [the National Association of Regulatory Utility Commissioners (NARUC)] guidelines call for affiliate pricing to be at market price, or the fully allocated cost, whichever is lower. Here, HSE presented evidence that shows

SAMCO's rates are at or below the rates charged by other similar firms, but presented no evidence concerning what SAMCO's fully allocated cost actually is. While we agree with HSE that the OUCC's 20% ($690,506) downward adjustment is arbitrary, the Commission would note that it is HSE, not the OUCC, which has the burden to prove its costs are reasonable. Because HSE failed to produce any evidence concerning SAMCO's fully allocated cost, the Commission is unable to determine whether the market prices charged by SAMCO, while at or below costs of its competitors, are at or below SAMCO's fully allocated cost.

Similarly, while the 10% management fee may be customary in the industry, SAMCO has failed to provide any evidence of what the actual fully allocated management cost is. In the absence of any evidence of actual cost, we decline to include the proposed management fee in rates.

Despite the failure to provide fully allocated cost information, we decline to deny recovery of all SAMCO-related expenses. Regardless of what entity performs the services tasked to SAMCO, those services are reasonable and necessary to the provision of utility service. The issue is the level of expense that should be approved in light of the evidence of record. Because HSE failed to demonstrate SAMCO's fully allocated costs, the Commission declines to approve [HSE's] proposed $115,498 ($54,728+$60,770) 3% increase in its contract operations cost with SAMCO, and accepts the OUCC's proposed $62,330 10% management fee reduction. Accordingly, we find SAMCO's pro forma Contract Services-Other expenses are at $2,003,649 and its pro forma Contract Services-Engineering expenses are $1,822,762.

In its next rate case, we direct HSE to offer evidence supporting SAMCO's fully allocated cost so that the Commission may determine the appropriate level of SAMCO expenses that should be included in HSE's rates. Further, we direct HSE to file with

the Commission all current affiliate agreements within 30 days of the date of this Order.

(Appellant's App. Vol. II, p. 27).

[25] NARUC "has issued guidelines for cost allocations and affiliate transactions." (OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 38). These guidelines "are intended to provide guidance to jurisdictional regulatory authorities and regulated utilities and their affiliates in the development of procedures and recording of transactions for services and products between a regulated entity and affiliates." (OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 171). NARUC recommends that "[g]enerally, the price for services, products and the use of assets provided by a non-regulated affiliate to a regulated affiliate should be at the lower of fully allocated cost or prevailing market prices. Under appropriate circumstances, prices could be based on incremental cost, or other pricing mechanism as determined by the regulator." (OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 174).

[26] Evidence presented at the hearing indicates that in HSE's prior rate case, the Commission found SAMCO's rates to be reasonable based on evidence of SAMCO's "market rates for its services" without regard to evidence of SAMCO's fully allocated costs. (OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 40). By suddenly shifting course in the present case and requiring compliance with the standard suggested by NARUC, HSE now contends that the Commission engaged in improper rulemaking contrary to the Administrative Rules and Procedures Act. However, we need not consider whether the

Commission has attempted to promulgate a new rule without going through the appropriate channels because we agree with HSE's alternative argument that the Commission acted arbitrarily. *See Citizens Action Coalition of Ind., Inc.*, 74 N.E.3d at 563 (noting that the Commission's order is binding unless it is arbitrary) (quoting *N. Ind. Pub. Serv.*, 907 N.E.2d at 1016). We are mindful of the Commission's broad discretion and responsibility for considering all aspects of a utility's operations to determine a just and reasonable rate. *United States Gypsum, Inc.*, 735 N.E.2d at 798; *see* I.C. § 8-1-2-4. Nevertheless, the Commission's unexplained reliance on a heretofore unapplied standard recommended by NARUC renders its decision arbitrary. *See* BLACK'S LAW DICTIONARY 112 (8th ed. 2004) (defining "arbitrary" as "[d]epending on individual discretion . . . rather than by fixed rules, procedures, or law").

[27] In *Cellco Partnership v. Ind. Utility Regulatory Comm'n*, 810 N.E.2d 1137, 1144 (Ind. Ct. App. 2004), the Commission departed from its own precedent concerning the confidentiality of certain data. Our court found no error in the Commission's decision "to take a different approach" because the Commission's findings made it clear that the Commission had "fully examined the issues" of the case and clearly explained why it had decided inconsistently with its own prior orders. *Id. See also Ind. Bell Tel. Co. v. Ind. Util. Regulatory Comm'n*, 810 N.E.2d 1179, 1186 (Ind. Ct. App. 2004) ("We note that an agency may change its course and is not forever bound by prior policy or precedent. That is, where a policy or precedent is flawed and needs to be changed, the agency may change the course as long as it explains the reasons for doing so."),

*trans. denied*. Here, the Commission found that the evidence established that SAMCO's rates are "at or below the" prevailing market rates, and that its management fee is "customary in the industry." (Appellant's App. Vol. II, p. 27). Even though this type of evidence was sufficient to establish the reasonableness of SAMCO's charges in HSE's prior rate case, the Commission failed to explain its decision to now adhere to the standard advocated by NARUC that the test for reasonableness is the lower of fully allocated cost or prevailing market prices. Moreover, although the OUCC presented vague evidence indicating that the Commission has "approved affiliate guidelines and cost allocation guidelines" in other utility cases, there is no evidence that it has previously enforced NARUC guidelines in this manner. Accordingly, we reverse the Commission with respect to the SAMCO fees and remand for either additional support for its decision or a recalculation of HSE's rate.

## B. *Working Capital Allowance*

[28] HSE also claims that the Commission erroneously excluded SAMCO's charges from its calculation of a working capital allowance. "Cash working capital represents the funds needed to be invested in the utility to give the utility the financial wherewithal to pay reasonable [operating and management] expenses in the ordinary course of business prior to recovery in rates." (Appellant's App. Vol. II, p. 15). "In other words, working capital is the money a utility must use to provide utility service before it receives payment for that service." (OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 24). "Working capital is considered an investment necessary for providing utility service and is included in rate base for

investor-owned utilities."  (OUCC Exh. 1—Non-Conf. Exh. Vol. III, pp. 24-25).

[29]     In this case, HSE calculated its working capital by using the Federal Energy Regulatory Commission's (FERC) 45-day methodology, which the Commission has previously approved.

> The FERC 45 day formula method calculates a percentage of operating expenses as the estimate of the working capital requirements for a utility.  This method assumes the difference between the lead/lag periods[5] . . . is 45 days and calculates 12.5% (45 days/360 days) of adjusted annual operating expenses as cash working capital.  This methodology typically adjusts operating expenses for those items known to be paid after the receipt of revenues or paid "in arrears."  The advantage of the formula method is that it is quick and inexpensive and has generally been thought to be a reasonable estimate of what a lead/lag study would produce without the related expense of a lead/lag study.

(OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 26).  HSE requested "an allowance for 45 days capital in the amount of $813,089."  (HSE Exh. 3—Non-Conf. Exh. Vol. I, p. 169).  However, the OUCC, in addition to arguing about the impropriety of the FERC 45-day methodology, sought the removal of

---

[5] A lead/lag study "measures the differences between (1) the time services are rendered until the revenues for that service are received, and (2) the time expenses are incurred until those expenses are paid."  (OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 25).

SAMCO's charges from the working capital calculation. In particular, the OUCC's evidence provided that

> [t]he fees and cost reimbursements HSE pays to SAMCO are generally billed at the end of the month and paid during the subsequent month. Therefore, SAMCO charges are paid in arrears when HSE has begun receiving revenues from its customers. There is no lag between when the expense is paid and when revenues are received. Therefore, there is no need to include these costs in the calculation of working capital.

(OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 27).

[30] Although it approved the FERC 45-day methodology, the Commission otherwise agreed with the OUCC and found:

> The reason that purchased utility expenses have been removed in accordance with the 45-day method is that such services are payable after utility customers make payment for the utility service that utilized the expense. For affiliate expenses such as those at issue here, we see little reason to require ratepayers to provide a return to the shareholders when the shareholders are on both sides of the transaction, especially in light of our concerns over the cost of the SAMCO services . . . . There is no reason that SAMCO could not adjust billing cycles so that SAMCO bills would be payable after customer payments were received by HSE. Ultimately, we agree with the OUCC that SAMCO expenses should be removed from HSE's working capital calculation.

(Appellant's App. Vol. II, p. 16). After removing SAMCO expenses and making other adjustments, the Commission determined that HSE's "revised working capital allowance is $111,779." (Appellant's App. Vol. II, p. 16). HSE

now asserts that the Commission improperly "disallowed the SAMCO charges because of HSE's purported failure to provide evidence of SAMCO's 'fully allocated cost' information and its unwarranted assumption that SAMCO could simply delay billing HSE." (HSE's Br. p. 48).

[31] In HSE's prior rate case, the Commission approved SAMCO's charges in HSE's working capital. However, based on the OUCC's testimony in the present case, the Commission found that SAMCO's "services are payable after utility customers make payment for the utility service that utilized the expense." (Appellant's App. Vol. II, p. 16). As described by the OUCC, the FERC 45-day methodology "adjusts operating expenses for those items known to be paid . . . in arrears." (OUCC Exh. 1—Non-Conf. Exh. Vol. III, p. 26). During rebuttal, HSE simply argued that "[t]he OUCC's proposal for working capital is completely unreasonable for a utility even a fraction of the size of HSE." (HSE Exh. 7—Non-Conf. Exh. Vol. IV, pp. 107-08). HSE also noted that "everything is paid in arrears, but so are the revenues. The revenues are billed in arrears and collected in arrears also, so there still has to be money to—you can't operate with no money in the bank." (Tr. Vol. II, pp. 18-19).

[32] Notwithstanding the Commission's other findings relating to its concerns about SAMCO's excessive cost or its ability to adjust its billing cycle, there is evidence to support the Commission's determination that SAMCO's expenses are paid in arrears. To find otherwise would amount to reweighing the evidence. Accordingly, we find no error in the Commission's decision to exclude SAMCO's charges from the calculation of HSE's working capital.

### III. *System Development Charge*

[33]   Upon HSE's request, the Commission granted a $450 increase to HSE's SDC in all service areas. This amounted to a total of $2,850 per EDU for most areas and $3,650 for the Flatfork Creek area. As HSE explained, the Flatfork Creek area required a higher SDC because the developer was entitled to an $800 surcharge "until 1750 EDUs are developed in the . . . area." (HSE Exh. 3—Non-Conf. Exh. Vol. I, p. 164). The OUCC agreed with the SDC increase.

[34]   After the parties had presented their evidence, on May 17, 2016, HSE filed its Submission of Exceptions and Reply Brief in response to the OUCC's proposed order for the Commission. In its Exceptions and Reply Brief, HSE stated:

> In October 2015, after HSE filed this rate proceeding, HSE's commitment to the seller of the Flatfork utility to pay $800 for each EDU developed in the Flatfork [area] w[as] satisfied, and HSE stopped collecting the $800 supplemental SDC in the Flatfork [area]. Therefore, Section 14 of HSE's Proposed Order submitted to the Commission on April 1, 2016, should be changed to reflect that the $800 supplemental SDC in the Flatfork . . . area is no longer being collected, and that the tariff filed in this rate matter should reflect a uniform SDC of $2,850 per EDU in all service areas of HSE, including the Flatfork . . . area.

(Appellant's App. Vol. III, p. 39).

[35]   HSE now argues "that the Commission erred in approving an SDC of $3,650 per EDU for the Flatfork Creek service area when HSE only sought an SDC of $2,850 per EDU." (HSE's Br. p. 52). However, as the OUCC points out,

HSE's Exceptions and Reply Brief "is argument of counsel and is not evidence that was entered into the record." (OUCC's Br. p. 46). While we certainly recognize that HSE should not be collecting excessive fees, it cannot be said that the Commission somehow erred by relying on the evidence that was properly before it.

IV. *Cross-Appeal*: *Inclusion of Income Taxes in Rate Calculation*

[36]     The OUCC claims that the Commission erred by allowing HSE to recover income taxes in its rates. During the hearing, evidence was presented that HSE is organized as an S Corporation. Thus, "[f]or federal and state income tax purposes, the shareholders of HSE have consented to have HSE's income taxed directly to them." (HSE Exh. 2—Non-Conf. Exh. Vol. I, p. 125). "In lieu of HSE paying taxes, the shareholders of an S Corporation are taxed on their proportionate share of the company's taxable income at each individual shareholder's respective tax rate." (HSE Exh. 2—Non-Conf. Exh. Vol. I, pp. 125-26). Accordingly, the OUCC insists that "authorizing HSE to include any state or federal income tax liability in its revenue requirement means HSE will be allowed an expense HSE will never incur." (OUCC's Br. p. 46).

[37]     The Commission must "establish a level of rates and charges sufficient to allow the utility to meet its operating expenses as well as a return on investment to compensate its investors." *South Haven Waterworks v. Office of Util. Consumer Counselor*, 621 N.E.2d 653, 654 (Ind. Ct. App. 1993). "Operating costs represent one component in the equation to determine the utility's total revenue requirement[,]" and "[t]he taxes paid by a utility are included within its

operating costs." *Id.* In the absence of an "adjustment for taxes, operating expenses will be lower resulting in a lower total revenue requirement." *Id.* at 654-55.

[38] Although HSE's tax liability is passed through to its shareholders, the Commission has previously recognized "the benefits of S Corporations as compared to C Corporations" because "the S Corporation structure tends to benefit both shareholders and ratepayers, under current tax laws, by avoiding higher C Corporation tax rates." (HSE Exh. 2—Non-Conf. Exh. Vol. I, pp. 127-28). As HSE explained, if, in the calculation of its rates, it were prohibited from including the tax liability that its shareholders incur, it "would inevitably convert to a . . . C [C]orporation" so that it could recover its tax expense. (HSE Exh. 8—Non-Conf. Exh. Vol. IV, p. 136). This would result in HSE paying higher taxes, "and in turn, HSE's customers would pay more tax expense." (HSE Exh. 8—Non-Conf. Exh. Vol. IV, p. 137). In the present case, the Commission found:

> We previously addressed treatment of S-Corporation taxes in Cause No. 43761, and decline the OUCC's invitation to reconsider our conclusion in that Cause, with the exception of the appropriate federal rate applicable to each shareholder. HSE included in its cost of service calculation an effective income tax rate based upon the Commission's methodology approved in Cause No. 43761. In that proceeding, the Commission found the appropriate method to determine actual federal income taxes is based on the individual shareholder's rates used by the Internal Revenue Service during the test year as if no other income is earned by the shareholder. Using the Commission's approved methodology from Cause No. 43761, HSE calculated a

combined federal and state tax rate of 27.43% to be used in its cost of service calculations.

During the hearing, the OUCC established that HSE's shareholders have differing filing statuses, such as married filing jointly. In Cause No. 43761, it appears that the Commission calculated HSE's tax rate using the tax rates applicable for single filing status. We find that it would be more appropriate to use the actual filing status of each HSE shareholder to calculate the tax rate. In doing so, HSE's combined federal and state tax rate shall be 26.82%.

(Appellant's App. Vol. II, p. 29).

[39] In *South Haven*, 621 N.E.2d at 655, this court determined that the utility, an S-Corporation, was "not entitled to an adjustment to operating expenses" based on its purported income tax. Although the *South Haven* court recognized that the utility itself does not incur a tax liability, it did not hold that S-Corporations are precluded from recovering the tax liability that is passed through to shareholders in its rates. *Id.* Rather, there was no evidence presented that the utility's "shareholders actually paid income taxes attributable to income from [the utility] during the test year or at any other time. The adjustment for income tax expenses of a corporation is available only when the corporation can demonstrate that taxes were actually paid." *Id.* Without evidence of the actual taxes paid, the *South Haven* court determined that to assign a certain tax liability as an operating expense incurred by the utility "would be speculative, arbitrary, hypothetical and unsupported by the record." *Id.*

Conversely, in the present case, evidence was presented that the shareholders of HSE actually paid income taxes at their personal rates for income attributable to HSE. The Commission clearly recognized that ratepayers would be subjected to higher rates to compensate for increased operating costs if the utility had to pay the higher tax rates of a C Corporation. The Commission exercised its discretion to calculate a just and reasonable rate. Therefore, we find no error in the Commission's determination that HSE may recover, as part of its operating costs, the income taxes its shareholders actually paid.

## CONCLUSION

Based on the foregoing, we conclude that the Commission is not a proper party to this appeal and is hereby dismissed. We further conclude that the Commission acted arbitrarily in excluding HSE's affiliate expenses (the 3% contract increase and 10% management fee) from HSE's rate calculation by relying on the NARUC guidelines without explanation; however, the Commission was within its discretion to consider the evidence and exclude the paid-in-arrears affiliate expenses from HSE's calculation of working capital. In addition, we conclude that the Commission did not err in its conclusion regarding HSE's SDC based on the evidence presented. Finally, the Commission properly permitted HSE to recover its passed-through income tax liability in its rates.

Affirmed in part, reversed in part, and remanded.

Robb, J. and Pyle, J. concur